20-3989-cv
Palmer v. Amazon

# In the
# United States Court of Appeals
## For the Second Circuit

---

August Term, 2020
No. 20-3989-cv

DERRICK PALMER, KENDIA MESIDOR, BENITA ROUSE, ALEXANDER
ROUSE, BARBARA CHANDLER, LUIS PELLOT-CHANDLER, DEASAHNI
BERNARD,
*Plaintiffs-Appellants,*

*v.*

AMAZON.COM, INC., AMAZON.COM SERVICES, LLC,
*Defendants-Appellees.*

---

On Appeal from a Judgment of the United States
District Court for the Eastern District of New York.

---

ARGUED: MAY 19, 2021
DECIDED: OCTOBER 18, 2022

---

Before: JACOBS, CHIN, and NARDINI, *Circuit Judges.*

---

This case involves claims brought by workers at Amazon's
JFK8 fulfillment center and members of the workers' households in

connection with the COVID-19 policies, practices, and procedures at JFK8. In their amended complaint Plaintiffs allege causes of action for public nuisance, breach of the duty to protect the health and safety of employees under New York Labor Law ("NYLL") § 200, violation of NYLL § 191 for failure to pay, on time and in full, COVID-19 sick leave under New York's COVID-19 sick leave law, and injunctive relief against future violations of NYLL § 191. The United States District Court for the Eastern District of New York (Brian M. Cogan, *Judge*) dismissed Plaintiffs' amended complaint, relying on the doctrine of primary jurisdiction, as well as alternative grounds, to dispose of the public nuisance and NYLL § 200 claims, and dismissing Plaintiffs' § 191 claim for failure to state a claim for relief based on COVID-19 sick leave payments not falling within § 191's definition of "wages." Plaintiffs now appeal. First, we reject Amazon's contention that we should partially dismiss this appeal as moot. Second, we agree with Plaintiffs that the district court wrongly applied the primary jurisdiction doctrine to their public nuisance and NYLL § 200 claims. Ultimately, however, only their § 200 claim survives. Accordingly, we hold: (1) Plaintiffs' public nuisance and NYLL § 200 claims are not moot; (2) the doctrine of primary jurisdiction does not apply to Plaintiffs' public nuisance or NYLL § 200 claims; (3) Plaintiffs fail to state a claim for public nuisance under New York law because they do not allege a special injury; (4) Section 11 of the New York Workers' Compensation Law does not preclude injunctive relief under NYLL § 200; and (5) COVID-19 sick leave payments are not "wages" under NYLL § 191. We therefore AFFIRM the district court's dismissal of Plaintiffs' public nuisance and NYLL § 191 claims; and we VACATE the district court's dismissal of Plaintiffs' NYLL § 200 claim and REMAND to the district court for further proceedings on that claim.

Judge Chin concurs in part and dissents in part in a separate opinion.

KARLA GILBRIDE, PUBLIC JUSTICE, Washington, DC (Emily Villano, Public Justice, Washington, DC, Juno Turner, David H. Seligman, and Valerie Collins, Towards Justice, Denver, CO, Beth Terrell, Terrell Marshall Law Group PLLC, Seattle, WA, *on the brief*), *for Plaintiffs-Appellants*.

JASON C. SCHWARTZ, Gibson, Dunn & Crutcher LLP, Washington, DC (Lucas C. Townsend, Lochlan F. Shelfer, Gibson, Dunn & Crutcher LLP, Washington, DC, Avi Weitzman, Zainab N. Ahmad, Gibson, Dunn & Crutcher LLP, New York, NY, *on the brief*), *for Defendants-Appellees*.

WILLIAM J. NARDINI, *Circuit Judge*:

Workers at Amazon's JFK8 fulfillment center and members of their households (together, "Plaintiffs") challenge workplace COVID-19 policies, practices, and procedures at JFK8. Their suit against Amazon.com, Inc. and Amazon.com Services LLC (together, "Amazon") in the United States District Court for the Eastern District of New York (Brian M. Cogan, *Judge*) asserts causes of action under

3

New York law for public nuisance, breach of the duty to protect the health and safety of employees under New York Labor Law ("NYLL") § 200, violation of NYLL § 191 for failure to pay, on time and in full, COVID-19 sick leave under New York's COVID-19 sick leave law, and injunctive relief against future violations of NYLL § 191. Amazon moved to dismiss Plaintiffs' amended complaint. In a memorandum decision and order filed on November 2, 2020, the district court granted Amazon's motion. On November 3, 2020, the district court entered judgment dismissing Plaintiffs' amended complaint.

The district court dismissed Plaintiffs' public nuisance and NYLL § 200 claims without prejudice under the primary jurisdiction doctrine, concluding that the questions before the court turned on factual issues requiring the technical and policy expertise of the Occupational Safety and Health Administration ("OSHA"). In the alternative, the district court concluded that Plaintiffs failed to allege

4

the special injury required to state a claim for public nuisance; that New York's Workers' Compensation Law preempts suit under NYLL § 200 for injunctive relief for past harm; and that Plaintiffs failed to allege a cognizable injury under NYLL § 200 based on the threat of future harm. The district court then dismissed with prejudice Plaintiffs' NYLL § 191 claims, concluding that COVID-19 leave payments are not "wages" as defined by § 191.

Plaintiffs now appeal the district court's dismissal. This appeal presents five key questions: (1) whether Plaintiffs' public nuisance and NYLL § 200 claims are moot because they are premised on New York Forward, a state-issued plan with industry-specific guidance for businesses that has since been rescinded; (2) whether the district court correctly applied the primary jurisdiction doctrine in dismissing Plaintiffs' state law claims in deference to OSHA; (3) whether Plaintiffs plausibly plead a special injury to support a public nuisance claim against Amazon; (4) whether the New York Workers'

5

Compensation Law bars claims for injunctive relief under NYLL § 200; and (5) whether NYLL § 191 establishes how and when COVID-19 sick leave pay must be paid.

First, we hold that Plaintiffs' public nuisance and NYLL § 200 claims are not moot. These claims continue to present a live controversy because they are not based solely on since-rescinded guidance associated with the New York Forward plan. Second, we hold that the doctrine of primary jurisdiction does not apply to Plaintiffs' public nuisance and NYLL § 200 claims. The issues before us—whether Amazon created a public nuisance and whether Amazon has breached its duty owed to Plaintiffs under NYLL § 200—turn on questions of state tort law that are within the conventional experience of judges. Although it is certainly within OSHA's competence to evaluate and create workplace health and safety standards, OSHA's expertise would not be a *material* aid here; the issues before us are of a legal, not factual, nature and do not require

6

the kind of highly factual inquiry that would typically be aided by OSHA's expertise. Furthermore, OSHA has not promulgated the kind of cross-industry COVID-19 workplace safety standards that might be applicable here. Third, we hold that although Plaintiffs may plead a harm that is different *in degree* from the community at large, they fail to plead a harm that is different *in kind*, thereby failing to allege the special injury required to state a claim for public nuisance under New York law. Fourth, we hold that New York's Workers' Compensation Law is concerned only with claims for monetary relief and leaves open claims against employers for injunctive relief under NYLL § 200. Lastly, we hold that NYLL § 191 determines the pay frequency for "wages" but not "benefits or supplemental wages." Because COVID-19 leave payments are not "wages" as defined by NYLL § 191, Plaintiffs do not have a private cause of action under § 191 for Amazon's alleged failure to comply with New York's COVID-19 sick leave law.

Accordingly, we AFFIRM the district court's dismissal of Plaintiffs' public nuisance claim and NYLL § 191 claims for damages and injunctive relief; and we VACATE the district court's dismissal of Plaintiffs' NYLL § 200 claim seeking a declaratory judgment and injunctive relief and REMAND to the district court for further proceedings on this claim.

## I.     Background

We assume the following facts, which are taken from Plaintiffs' amended complaint, to be true for the purposes of this appeal. *Kolbasyuk v. Cap. Mgmt. Servs., LP*, 918 F.3d 236, 238 n.1, 239 (2d Cir. 2019).

### A.     Amazon's Operations at JFK8

The JFK8 fulfillment center ("JFK8") is a facility operated by Amazon in Staten Island, New York.  JFK8 covers approximately 840,000 square feet and runs twenty-four hours per day, seven days per week.  On average, JFK8 employs 3,500 workers at any given time.

8

During peak seasons—the period around Amazon Prime Day in July and the months leading up to Christmas—the workforce expands to approximately 5,000.  During the course of the pandemic, Amazon's national workforce expanded.  As of April 2020, Amazon had hired 175,000 more workers to account for increased demand for online shopping and product delivery.

Amazon tracks its employees' activity through devices workers use to scan items and packages.  It uses this information to determine whether employees are on task and to calculate an employee's total time off task ("TOT") for each shift.  An employee's TOT in a shift is not to exceed thirty minutes.  TOT greater than thirty minutes results in a written warning; TOT greater than sixty minutes results in a final written warning; and TOT greater than 120 minutes results in an automatic termination.  Employees accumulate TOT during bathroom breaks.  An employee's supervisor must re-code certain TOT activities to prevent them from contributing to an employee's

9

total TOT. Supervisors cannot re-code TOT for bathroom breaks, but they can decide whether to discipline an employee for exceeding TOT limits because of those breaks.

### B. New York's response to the COVID-19 pandemic

On March 1, 2020, New York announced its first confirmed case of COVID-19. On March 20, 2020, then-New York Governor Andrew Cuomo issued the New York State on PAUSE Executive Order. Exec. Order No. 202.6 (N.Y. Mar. 22, 2020). The Order permitted essential businesses—those providing products or services required to maintain the health, safety, and welfare of New Yorkers—to remain open. Amazon was deemed an essential business.

In May 2020, New York began a phased reopening of non-essential businesses under the New York Forward plan. The plan provided detailed, industry-specific guidance for essential businesses and non-essential businesses that were permitted to reopen. The guidance outlined "minimum requirements" businesses needed to

follow to remain open. JFK8 was subject to the New York Forward Interim Guidance for the Wholesale Trade Sector.

In parallel to the Governor's executive action, on March 18, 2020, the New York legislature responded to the pandemic by enacting a COVID-19 sick leave law (the "Leave Law"). *See* 2020 N.Y. Sess. Laws ch. 25 (McKinney). The Leave Law requires employers to pay sick leave to employees who are "subject to a mandatory or precautionary order of quarantine or isolation issued by the state of New York, the department of health, local board of health, or any governmental entity duly authorized to issue such order to COVID-19." *Id.* § 1.1(a). The amount of sick leave an employer must provide varies based on its number of employees. Employers with a workforce of one hundred or more must give at least fourteen days of paid sick leave during any mandatory or precautionary order of quarantine or isolation. *Id.* § 1.1(c).

11

## C.    Plaintiffs' allegations

Plaintiffs are warehouse workers at JFK8 and members of the employees' households.  The employee plaintiffs are Derrick Palmer, Benita Rouse, Barbara Chandler, and Deasahni Bernard.  Their roles all involve working close to other team members, and most of their roles include touching items that other workers have handled.  The remaining plaintiffs (together, the "Non-Employee Plaintiffs") live in the households of the employee plaintiffs: Kendia Mesidor is in a relationship with Derrick Palmer, and Alexander Rouse and Luis Pellot-Chandler are the children of Benita Rouse and Barbara Chandler, respectively.  Chandler and Bernard contracted COVID-19 while employed at JFK8.    Members of Chandler's household experienced symptoms of COVID-19, including her cousin who died in April 2020.

As the pandemic hit New York in spring 2020, Plaintiffs became concerned that Amazon was disregarding federal and state

12

guidance—namely, the New York Forward plan, the Leave Law, and guidance from the federal government's Centers for Disease Control and Prevention ("CDC")—and thereby creating an unsafe workplace during a global pandemic.

Plaintiffs allege that Amazon deters workers from social distancing, washing hands, and disinfecting workstations. Plaintiffs point to a primary root cause: TOT requirements. Although Amazon purportedly suspended TOT tracking requirements and productivity feedback in March 2020, Plaintiffs allege that Amazon did not inform workers of this change until an announcement on July 13, 2020. According to Plaintiffs, even after Amazon's July announcement, managers continued to post TOT rate goals around the JFK8 facility and to encourage workers to meet those goals. Plaintiffs assert that Amazon's mixed messages and lack of communication concerning TOT and rate policies discourage workers from leaving their workstations to wash their hands and from taking time to disinfect

13

their work area.  Although workers in some departments can re-code their time to indicate that they are "off task" to address a dangerous condition, equipment malfunction, or injury, Amazon does not provide the same re-coding mechanism for employees breaking to wash hands, social distance, or sanitize workstations.

Next, Plaintiffs allege that Amazon failed to implement any policy regarding social distancing.  Only two of the breakrooms at JFK8 are air-conditioned, concentrating workers in those rooms during the hotter spring and summer months.  Moreover, Amazon changed its break policies, shifting from two twenty-minute breaks plus lunch per shift to one thirty-five-minute break plus lunch per shift.  Plaintiffs allege this change thwarts workers' ability to social distance because more employees are in breakrooms, bathrooms, and hallways at a given time.

Plaintiffs further allege that Amazon makes COVID-19 sick leave inaccessible and fails to pay workers on time and in full under

the Leave Law, which encourages workers to forgo taking leave and attend work while sick. A JFK8 worker who has symptoms of COVID-19 or who is exposed to someone with the virus is required to communicate with Amazon's human resources ("HR") team before taking sick leave pursuant to the Leave Law. The process for learning whether the employee can stay home is lengthy and confusing. Plaintiffs recount situations in which they repeatedly called the HR team but were unable to speak with one of its team members. Once an employee finally learns that they must quarantine, Amazon fails to timely provide the employee with full payment of COVID-19 sick pay.

Plaintiffs also allege that Amazon's handling of contact-tracing fails to adequately track employees who test positive for COVID-19 and the coworkers with whom they came into close contact. Amazon does not track the symptoms of workers who report exposure to COVID-19, and it allegedly discourages workers from informing their

15

colleagues that they tested positive for the virus. Amazon also does not ask COVID-19-positive employees with whom they have come into close contact at JFK8. Amazon relies solely on surveillance technology to make these contact determinations, which Plaintiffs argue is inadequate.

Lastly, Plaintiffs allege that Amazon fails to deep clean JFK8 and close the facility, whether in whole or in part, after receiving confirmation that a worker tested positive for COVID-19.

### D. District court proceedings

On June 3, 2020, Plaintiffs filed a complaint in the U.S. District Court for the Eastern District of New York asserting claims for public nuisance, breach of duty under NYLL § 200, and violations of NYLL § 191 for failure to pay, on time and in full, COVID-19 sick leave. Plaintiffs also filed a motion for a preliminary injunction, which they subsequently withdrew after Amazon's announcement on July 13, 2020, concerning changes to productivity policies.

On July 28, 2020, Plaintiffs filed an amended four-count

16

complaint expanding their NYLL § 191 claims into a statewide class action and adding an additional named Plaintiff. In Count I, Plaintiffs assert that Amazon is creating a public nuisance by failing to comply with minimum basic health and safety standards at JFK8. Plaintiffs seek injunctive relief and a declaratory judgment under 28 U.S.C. § 2201. In Count II, Plaintiffs allege that Amazon is breaching its duty to protect the health and safety of its employees under NYLL § 200, seeking injunctive relief and a declaratory judgment under 28 U.S.C. § 2201. In Count III, Plaintiffs seek damages for Amazon's alleged failure to timely pay earned COVID-19 sick leave under NYLL § 191. In Count IV, Plaintiffs seek to enjoin Amazon from future failures to pay earned COVID-19 sick leave on time under NYLL § 191.

On August 11, 2020, Amazon filed a motion to dismiss the amended complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). The district court granted Amazon's motion on November 2, 2020, and entered judgment the following day. Under

17

the doctrine of primary jurisdiction, the district court dismissed, without prejudice, Plaintiffs' public nuisance and NYLL § 200 claims. The court concluded that because the relief Plaintiffs seek "involves detailed aspects of how Amazon regulates its workplace," Plaintiffs' claims turned "on factual issues requiring [OSHA's] technical and policy expertise." App'x at 137. The risk of inconsistent rulings absent agency deferral and the advantages of applying the doctrine also tipped in favor of invoking primary jurisdiction. In the alternative, the district court concluded that Plaintiffs fail to state a public nuisance claim because they do not allege special injury, that Plaintiffs' claim for past harm under NYLL § 200 is preempted by New York's Workers' Compensation Law, and that Plaintiffs' NYLL § 200 claim based on the threat of future harm fails to allege a cognizable injury. As to Plaintiffs' NYLL § 191 claims, the district court concluded that Plaintiffs cannot state a claim for relief because COVID-19 sick leave payments are not "wages" under § 191.

18

On November 24, 2020, Plaintiffs filed a timely notice of appeal.

**II. Discussion**

We review *de novo* a district court's grant of a motion to dismiss under Rules 12(b)(1) and 12(b)(6), accepting the allegations in the complaint as true and drawing all reasonable inferences in favor of the plaintiff. *Atterbury v. U.S. Marshals Serv.*, 805 F.3d 398, 403 (2d Cir. 2015); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When a district court invokes the primary jurisdiction doctrine, our standard of review is likewise *de novo*. *Nat'l Commc'ns Ass'n, Inc. v. Am. Tel. & Tel. Co.*, 46 F.3d 220, 222 (2d Cir. 1995) [hereinafter *AT&T Co.*] ("[T]he standard of review [of a dismissal on the basis of the primary jurisdiction doctrine] is essentially *de novo*." (citation omitted)); *see also Seneca Nation of Indians v. New York*, 988 F.3d 618, 629 (2d Cir. 2021) ("We review a district court's decision not to apply the doctrine of primary jurisdiction de novo."); *Ellis v. Tribune Television Co.*, 443 F.3d 71, 83 n.14 (2d Cir. 2006) (same).

On appeal, Plaintiffs ask us to vacate the grant of Amazon's motion to dismiss, challenging the district court's conclusions that: deference is due to OSHA under the primary jurisdiction doctrine; Plaintiffs fail to plausibly allege special harm sufficient to state a claim for public nuisance; the claim under NYLL § 200 is preempted by New York's Workers' Compensation Law; and COVID-19 sick leave payments do not constitute "wages" as defined by NYLL § 191. Amazon moves for partial dismissal of Plaintiffs' appeal, arguing that Plaintiffs' public nuisance and NYLL § 200 claims are moot because New York has since rescinded the guidance upon which these claims rely.

As a preliminary matter, we deny Amazon's motion for partial dismissal. Plaintiffs' public nuisance and NYLL § 200 claims are not moot because these claims do not rely solely upon rescinded New York guidance, and it is still possible for a court to grant Plaintiffs injunctive and declaratory relief if they are the prevailing party.

20

Turning to the merits, we agree with Plaintiffs that the district court wrongly applied the primary jurisdiction doctrine to their public nuisance and NYLL § 200 claims. But ultimately, as we explain below, only Plaintiffs' NYLL § 200 claim survives dismissal.

### A. Plaintiffs' public nuisance and NYLL § 200 claims are not moot

As a threshold matter, we must consider Amazon's motion for partial dismissal of the appeal on mootness grounds. "[M]ootness doctrine ensures that [a] litigant's interest in the outcome continues to exist throughout the life of the lawsuit." *Conn. Citizens Def. League, Inc. v. Lamont*, 6 F.4th 439, 444 (2d Cir. 2021) (internal quotation marks omitted). If because of changed circumstances "a case that presented an actual redressable injury at the time it was filed ceases to involve such an injury, it ceases to fall within a federal court's Article III subject matter jurisdiction and must be dismissed for mootness." *Id.* (internal quotation marks omitted). "A case becomes moot when it is impossible for a court to grant any effectual relief whatever to the

21

prevailing party." *Id.* (internal quotation marks omitted).

Amazon argues that Plaintiffs' public nuisance and NYLL § 200 claims are moot because the guidance on which these claims rely, the New York Forward plan, has since been rescinded.[1] We read the amended complaint differently. Contrary to Amazon's argument, Plaintiffs' claims do not rely solely on alleged violations of New York Forward guidance. Instead, Plaintiffs use the New York Forward guidance as one of several guideposts—alongside, for example, the Leave Law and CDC guidance—for establishing the minimum duty Amazon owes to Plaintiffs with respect to worker health and safety at JFK8 in the face of COVID-19.

Accordingly, a live controversy remains. In particular, rescission of the New York Forward guidance did not resolve

---

[1] As of June 15, 2021, New York lifted most COVID-19 restrictions, including most New York Forward guidance. New York State, *New York Forward*, *Archived Industry Guidance*, https://forward.ny.gov/archived-industry-guidance (last visited October 14, 2022) (explaining how the "archived *New York Forward* industry reopening guidance documents are no longer mandatory").

whether Amazon "provide[s] reasonable and adequate protection to the lives, health and safety" of its employees in conformity with NYLL § 200,[2] App'x at 120, nor did it resolve whether Amazon has created a public nuisance. Even if Plaintiffs now lack their preferred guidepost to establish Amazon's minimum duty to its employees, "[a]s long as [Plaintiffs] have a concrete interest in the outcome of the litigation, the case is not moot." *Firefighter's Local 1784 v. Stotts*, 467 U.S. 561, 568 (1984); *see New Eng. Health Care Emps. Union, Dist. 1199 v. Mount Sinai Hosp.*, 65 F.3d 1024, 1029 (2d Cir. 1995) ("[S]o long as

---

[2] Amazon also points to a May 10, 2022, decision of the First Department of the Appellate Division of the New York Supreme Court to argue that Plaintiffs' NYLL § 200 claim should be dismissed as moot. *See* Appellees' Rule 28(j) Ltr. (May 12, 2022). There, the First Department concluded that the New York Attorney General's NYLL § 200 claim "seeking a permanent injunction requiring Amazon to undertake policies consistent with COVID-19 workplace guidelines issued by the State must be dismissed as moot, as the State has withdrawn the public health guidance that the claim seeks to enforce, including by prospective injunctive relief." *New York v. Amazon.com*, 205 A.D.3d 485, 487 (1st Dep't 2022). That decision does not alter our conclusion here. At bottom, the New York Attorney General in the New York case specifically sought to enforce guidance that is no longer in place. In comparison, as we explain above, Plaintiffs do not seek to enforce the now-withdrawn New York guidance. Rather, Plaintiffs rely upon New York guidance as one of several guideposts to argue that Amazon is breaching the duty of care it owes to JFK8 workers under NYLL § 200.

the appellant retains some interest in the case, so that a decision in its favor will inure to its benefit, its appeal is not moot."). Having considered the remainder of Amazon's justiciability arguments, we find them meritless and turn to the substance of Plaintiffs' appeal.

**B. The district court incorrectly applied the primary jurisdiction doctrine in dismissing Plaintiffs' state law claims in deference to OSHA**

The federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them." *Tassy v. Brunswick Hosp. Ctr., Inc.*, 296 F.3d 65, 73 (2d Cir. 2002) (quoting *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)). Here, we must address a "relatively narrow" exception to this obligation: the doctrine of primary jurisdiction. *Goya Foods, Inc. v. Tropicana Prods., Inc.*, 846 F.2d 848, 851 (2d Cir. 1988). The doctrine is a prudential one, *Schiller v. Tower Semiconductor Ltd.*, 449 F.3d 286, 294–95 (2d Cir. 2006), fashioned by the courts, *TCG N.Y., Inc. v. City of White Plains*, 305 F.3d 67, 74 (2d Cir. 2002), concerned primarily with "promoting relationships between the courts and [the] administrative

24

agencies charged with particular regulatory duties," *Ellis*, 443 F.3d at 81 (quoting *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 63 (1956)), and with ensuring the two "do not work at cross-purposes," *id.* (internal quotation marks omitted). The doctrine of primary jurisdiction "applies where a claim is originally cognizable in the courts, but enforcement of the claim requires, or is materially aided by, the resolution of threshold issues, usually of a factual nature, which are placed within the special competence of the administrative body." *Golden Hill Paugussett Tribe of Indians v. Weicker*, 39 F.3d 51, 58–59 (2d Cir. 1994).

For a court to invoke the primary jurisdiction doctrine, it must determine that the agency, not the courts, should have the "*initial decisionmaking responsibility.*" *Ellis*, 443 F.3d at 81 (emphasis added) (internal quotation marks omitted). A court's application of the primary jurisdiction doctrine thus "does not [necessarily] deprive the court of jurisdiction." *Reiter v. Cooper*, 507 U.S. 258, 268–69 (1993).

Rather, once a court determines that the doctrine applies, it has discretion either: (1) to retain jurisdiction or (2) to dismiss the case without prejudice. *Id.*

If the court retains jurisdiction, the case is "held pending the conclusion of an appropriate administrative proceeding." *Gen. Am. Tank Car Corp. v. El Dorado T. Co.*, 308 U.S. 422, 433 (1940); *see W. Pac. R.R. Co.*, 352 U.S. at 64 ("[T]he judicial process is suspended pending referral of such issues to the administrative body for its views."). In other words, the case is "stayed so as to give the plaintiff a reasonable opportunity within which to apply to the [agency] for a ruling." *Mitchell Coal & Coke Co. v. Pa. R.R. Co.*, 230 U.S. 247, 267 (1913); *see also Reiter*, 507 U.S. at 268 n.3 (observing that "'[r]eferral' is sometimes loosely described as a process whereby a court refers an issue to an agency," and clarifying that the Supreme Court's decision in *Mitchell Coal* "spelled out the actual procedure contemplated [in] holding that further action by the district court should be stayed so as to give the

plaintiff a reasonable opportunity within which to apply to the [agency] for a ruling as to the reasonableness of the practice" (internal quotation marks omitted)).

A court in its discretion may choose to dismiss the case without prejudice—but only "if the parties would not be unfairly disadvantaged." *Reiter*, 507 U.S. at 268. To determine whether a party will be unfairly disadvantaged, a court can look to the relief the party is seeking. For example, in *Carnation Co. v. Pacific Westbound Conference*, the Supreme Court distinguished between a plaintiff seeking injunctive relief and a plaintiff seeking damages. 383 U.S. 213, 222–23 (1966). There, the Supreme Court noted how, unlike a suit for injunctive relief from continuing conduct—a suit that "could easily be reinstituted if and when the [agency] determined" the questions at issue—a "damage[s] action for past conduct cannot be easily reinstated at a later time" because "[s]uch claims are subject to the Statute of Limitations." *Id.* Our Court applied these principles in

*Mathirampuzha v. Potter*, where we vacated the district court's dismissal and remanded with instructions to stay the proceedings pending a final determination by the administrative agency because dismissing the case presented "a significant danger of unfair disadvantage . . . inasmuch as the plaintiff's claim [was] subject to a statute of limitations." 548 F.3d 70, 84–85 (2d Cir. 2008).

When determining whether to apply the doctrine of primary jurisdiction, a court must look to "whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation." *W. Pac. R.R. Co.*, 352 U.S. at 64. These reasons and purposes are two-fold. *Tassy*, 296 F.3d at 68. First, the doctrine seeks to foster "uniformity and consistency in the regulation of business entrusted to a particular agency." *Goya Foods*, 846 F.2d at 851 (alteration omitted) (quoting *Nader v. Allegheny Airlines, Inc.*, 426 U.S. 290, 303–04 (1976)); *see Tex. & Pac. Ry. Co. v. Abilene Cotton Oil Co.*, 204 U.S. 426, 440 (1907)

28

(concluding that "without previous action by the [agency], power might be exerted by courts and juries generally to determine the reasonableness of an established rate, [and] it would follow that unless all courts reached an identical conclusion a uniform standard of rates in the future would be impossible"). Second, the doctrine recognizes that, for certain matters, "'the expert and specialized knowledge of the agencies' should be ascertained before judicial consideration of the legal claim." *Goya Foods*, 846 F.2d at 851 (quoting *W. Pac. R.R.*, 352 U.S. at 64); *see Great N. Ry. Co. v. Merchs.' Elevator Co.*, 259 U.S. 285, 291 (1922) (invoking primary jurisdiction because "the inquiry is essentially one of fact and of discretion in technical matters").

With the doctrine's reasons and purposes in mind, we turn to whether deferring to OSHA here is appropriate. Although "[n]o fixed formula exists for applying the doctrine of primary jurisdiction," *Ellis*, 443 F.3d at 82 (quoting *W. Pac. R.R. Co.*, 352 U.S. at 64), and we

29

generally conduct our analysis on a "case-by-case basis," *Gen. Elec. Co. v. MV Nedlloyd*, 817 F.2d 1022, 1026 (2d Cir. 1987), in *Ellis v. Tribune Television Co.*, our Court highlighted four factors—which we refer to here as the "*Ellis* factors"—upon which we focus our analysis:

> (1) whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise; (2) whether the question at issue is particularly within the agency's discretion; (3) whether there exists a substantial danger of inconsistent rulings; and (4) whether a prior application to the agency has been made.

443 F.3d at 82–83. We must also "balance the advantages of applying the doctrine against the potential costs resulting from complications and delay in the administrative proceedings." *Id.* at 83 (quoting *AT&T Co.*, 46 F.3d at 223).

### 1.    The *Ellis* Factors

Upon weighing the *Ellis* factors, balancing the advantages of applying the doctrine of primary jurisdiction with the potential costs, and considering the doctrine's two-fold aim—particularly the

30

importance of the courts staying their hand in favor of an agency's knowledge and expertise—we conclude that the district court incorrectly applied the doctrine to Plaintiffs' public nuisance and NYLL § 200 claims.

### a. The question at issue is within the conventional experience of judges

Amazon argues that "Plaintiffs have asked the district court to craft out of whole cloth a series of regulations applicable to JFK8 alone," which it contends "is not the core competence of courts." Amazon Br. at 21. But the issues before us are tort-based claims—public nuisance and breach of NYLL § 200—that are within the conventional experience of judges.

Generally, we decline to apply the doctrine of primary jurisdiction "when the issue at stake is legal in nature and lies within the traditional realm of judicial competence." *Goya Foods*, 846 F.2d at 851. For instance, in determining whether it was appropriate to apply the doctrine, we have identified the following as within "the daily fare

of federal judges," *Schiller*, 449 F.3d at 295: statutory interpretation, *id.*; applying "reasonably settled definitions" in a statute to the facts of a case, *F.T.C. v. Verity Int'l, Ltd.*, 443 F.3d 48, 60 (2d Cir. 2006); issues of contract interpretation, *Fulton Cogeneration Assocs. v. Niagara Mohawk Power Corp.*, 84 F.3d 91, 97 (2d Cir. 1996); and issues involving "the application of common law principles," *Gen. Elec. Co.*, 817 F.2d at 1027–28.

Looking at the questions before us here, courts routinely decide whether a defendant's conduct constitutes a public nuisance. *See, e.g.*, *Benoit v. Saint-Gobain Performance Plastics Corp.*, 959 F.3d 491, 504–05 (2d Cir. 2020); *Connecticut v. Am. Elec. Power Co.*, 582 F.3d 309, 353 (2d Cir. 2009), *rev'd on other grounds*, 564 U.S. 410 (2011); *New York v. Shore Realty Corp.*, 759 F.2d 1032, 1050–52 (2d Cir. 1985); *532 Madison Ave. Gourmet Foods v. Finlandia Ctr.*, 96 N.Y.2d 280, 292 (2001); *see also Tull v. United States*, 481 U.S. 412, 423 (1987) ("A public nuisance action was a classic example of the kind of suit that relied on injunctive relief

32

provided by courts in equity."). In addressing this issue, we must answer antecedent questions of whether a defendant is endangering the health or safety of a considerable number of persons and whether a plaintiff has alleged that they suffer special injury beyond that suffered by the community at large. *See Benoit*, 959 F.3d at 504–05; *532 Madison Ave.*, 96 N.Y.2d at 292.

Similarly, Plaintiffs' § 200 claim presents questions sounding in state tort law, and routinely addressed by courts: what duty of care Amazon owes to Plaintiffs and whether Amazon is in breach of its duty. *See, e.g., In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 758 F.3d 202, 210 (2d Cir. 2014); *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 428 (2d Cir. 2013); *Akins v. Glens Falls City Sch. Dist.*, 53 N.Y.2d 325, 331, 333 (1981). As NYLL § 200 is a codification of the common law duty to provide workers with a safe work environment, *e.g., Lombardi v. Stout*, 80 N.Y.2d 290, 294 (N.Y. 1992); *Everitt v. Nozkowski*, 285 A.D.2d 442, 443 (2d Dep't 2001), a federal court here

33

can look to New York's common law to inform its determination as to whether Amazon breached the duty of care it owed to Plaintiffs. And where common law principles are at play, we have determined that the issues should be addressed in a judicial forum. *See, e.g.*, *Gen. Elec. Co.*, 817 F.2d at 1027–28 ("[T]he application of common law principles [is] more competently decided in a judicial forum" (internal citations omitted)).

Amazon also takes issue with the relief Plaintiffs seek, arguing that Plaintiffs ask the district court to regulate through an injunction and to address "detailed aspects" of operations at JFK8, thereby making OSHA, not the courts, the forum best positioned to evaluate Plaintiffs' claims. Amazon Br. at 23–24. But Amazon's arguments about the possible scope of relief do not transform the traditional state tort law questions before us into issues requiring OSHA's technical and policy expertise. Before relief can be fashioned, questions of injury, duty, and breach must be addressed. These questions,

34

including whether the relief requested exceeds that warranted by the injuries alleged, are squarely within a district court's bailiwick.

### b. The question at issue is not particularly within the agency's discretion

To determine whether a question falls particularly within an agency's discretion, a court looks not to whether administrative proceedings will make *any* contribution to resolving the question before it, but whether administrative proceedings are "likely to make a *meaningful* contribution" to resolving the question. *Ricci v. Chi. Mercantile Exch.*, 409 U.S. 289, 306 (1973) (emphasis added) (internal quotation marks omitted). Thus, under the second *Ellis* factor we ask "whether an agency's review of the facts 'will be a *material* aid' to the court ultimately charged with applying" the facts to the law. *Tassy*, 296 F.3d at 73 (emphasis added) (quoting *Ricci*, 409 U.S. at 305). OSHA's review of these facts would not be such an aid.

Congress created OSHA through the Occupational Safety and Health Act of 1970 (the "OSH Act") to "assure . . . safe and healthful

working conditions" for workers by setting and enforcing standards and providing research, education, and training in the field of occupational safety and health. 29 U.S.C. § 651. It is therefore within OSHA's competence to evaluate and create workplace health and safety standards. But even assuming this case falls within that competence, "[i]n the primary jurisdiction context, whether an agency is statutorily authorized to resolve a particular issue is not itself determinative of whether to apply the doctrine." *Tassy*, 296 F.3d at 73.

To determine whether an agency's expertise would materially aid the court, we often assess whether a given issue is "legal in nature," *Goya Foods*, 846 F.2d at 851–52, or "of a factual nature," *Golden Hill Paugussett Tribe of Indians*, 39 F.3d at 58–59. For example, we have concluded that it is particularly within the Bureau of Indian Affairs' discretion to resolve "factual issues regarding tribal status," *Id.* at 60, and that the Federal Communications Commission's exclusive

authority over licensing materially aids the "highly factual inquiry" of whether to apply a license waiver. *Ellis*, 443 F.3d at 83–85. But even in those instances, categorizing the nature of the issue does not end our inquiry.

When a court is asked to resolve a factual issue the subject-matter of which falls within an agency's purview, the question is not whether, in the abstract, it would be helpful for the agency to set standards of its own. The issue is instead whether the agency's expertise would materially assist the court in resolving difficult factual questions to determine whether specified legal standards have been violated. For instance, in *Tassy v. Brunswick Hospital Center, Inc.*, an agency's medical expertise was not required to resolve the pertinent factual issue before the Court: whether the defendant committed the alleged sexual harassment. 296 F.3d at 70–71. The issue did not "implicate any medical data or complex records," and so, it was not particularly difficult for a court to handle, nor

particularly necessary for an agency to resolve. *Id.* Similarly, in *AT&T Co.*, determining whether a party qualified for a lower contract tariff rate depended on answering the "rather simple factual question" of whether a party had timely paid its bills, a question whose resolution was "within the district court's experience" and did not require the FCC's "policy expertise, or its specialized knowledge." 46 F.3d at 223.

In support of its contention that the public nuisance and NYLL § 200 questions before us are particularly within OSHA's discretion, Amazon argues that Plaintiffs' claims "turn on factual issues requiring both technical and policy expertise." Amazon Br. 23 (internal quotation marks omitted). Amazon highlights how, as of December 2020, OSHA had "conduct[ed] more than 1,430 COVID-related inspections and issu[ed] citations totaling more than $3,849,222 to 294 employers." *Id.* at 25. But Amazon fails to mention that OSHA issued most of those COVID-related citations to employers in the healthcare sector. *See* Dep't of Labor Br. at 33, *AFT*

38

*v. OSHA*, No. 20-73203 (9th Cir. Dec. 31, 2020) (noting that, of the 294 employers to have received COVID-related citations, 261 were employers in the healthcare sector). As such, the COVID-related citations are consistent with OSHA's other actions during the pandemic that have prioritized healthcare workers—namely, its issuance of an emergency temporary standard ("ETS," discussed at greater length below) governing the health and safety of healthcare and healthcare support workers. These healthcare-focused actions, therefore, do not necessarily suggest that OSHA's expertise would materially aid the court in resolving the issues relating to JFK8.

Indeed, no OSHA action to date, nor any executive order concerning worker health and safety, confirms that deferring to OSHA would be appropriate. On January 21, 2021, President Biden issued a proclamation directing OSHA to issue revised guidance for employers during the COVID-19 pandemic and to "consider whether any emergency temporary standards on COVID-19 . . . are necessary."

Proclamation No. 13999, 86 Fed. Reg. 7,211, § 2(b) (Jan. 21, 2021).  In response, OSHA issued the following in January 2021: (1) guidance clarifying that OSHA's existing standards that protect workers from infectious diseases—*see, e.g.*, 29 C.F.R. §§ 1910.134 (standard for respiratory protection), 1910.136 (standard for personal protective equipment), 1910.141 (standard for sanitation)—remain in place as protection from contracting and spreading COVID-19, *see* Dep't of Labor, Occupational Safety & Health Admin., *Protecting Workers: Guidance on Mitigating and Preventing the Spread of COVID-19 in the Workplace* (posted Jan. 29, 2021) (updated June 10, 2021), https://www.osha.gov/coronavirus/safework; and (2) an ETS "to protect healthcare and healthcare support service workers from occupational exposure to COVID-19,"  86 Fed. Reg. 32,376, 32,376.  On November 5, 2021, OSHA issued another ETS, one aimed at protecting "unvaccinated employees of large employers (100 or more employees) from the risk of contracting COVID-19 by strongly

40

encouraging vaccination."[3]  86 Fed. Reg. 61,402, 61,402.  The Supreme Court temporarily stayed the latter ETS on January 13, 2022, *see Nat'l Fed'n of Indep. Bus. v. Dep't of Labor*, 142 S. Ct. 661, 666–67 (2022), and shortly thereafter, OSHA withdrew it, *see* 87 Fed. Reg. 3,928.

Although OSHA has since rescinded the November 2021 vaccination and testing ETS, Amazon argues that "even if the ETS never takes effect, it still represents an unambiguous assertion of OSHA's expertise and jurisdiction over the health-and-safety issues at issue here."  Amazon 28(j) Ltr. at 2 (Jan. 20, 2022).  And that "[e]ven if the ETS currently lacks preemptive force," the OSH Act still preempts Plaintiffs' NYLL § 200 claim.  *Id.*  We disagree.

With the ETS rescinded, there is no risk that, by resolving Plaintiffs' claims, a court would be wading into an area already

---

[3] OSHA issued the vaccination and testing ETS after President Biden urged the agency to promulgate an emergency temporary standard requiring "all employers with 100 or more employees . . . to ensure their workforces are fully vaccinated or show a negative test at least once a week."  President Joseph Biden, Remarks on Fighting the COVID-19 Pandemic (Sept. 9, 2021), https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/09/09/ remarks-by-president-biden-on-fighting-the-covid-19-pandemic-3/.

41

occupied by OSHA.  And even had OSHA not rescinded the ETS, there is no reason to think that the agency was poised to "unambiguous[ly] assert[]" jurisdiction over Plaintiffs' claims, which concern, among other things, social distancing and sick leave.  Indeed, the rescinded ETS limited itself to vaccination.  Accordingly, even if OSHA were to indicate that it was on the verge of re-entering the fray on *vaccination*, that would hardly lead to the conclusion that the agency was planning to go so far as to regulate sick leave, social distancing, or any other areas implicated by Plaintiffs' claims.  Under these circumstances, we conclude that OSHA's particular expertise would not materially aid the resolution of Plaintiffs' claims.

### c. There is no substantial danger of inconsistent rulings

Because OSHA has chosen not to promulgate a cross-industry, COVID-19-specific standard that would govern the facts of this case, our conclusion that the primary jurisdiction doctrine does not apply presents no substantial danger of inconsistent rulings.  "Federal

regulation of the workplace [under the OSH Act] was not intended to be all encompassing." *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 96 (1992). Instead, "Congress expressly saved two areas from federal pre-emption": (1) "Section 4(b)(4) of the OSH Act states that the Act does not . . . 'enlarge or diminish or affect in any other manner the common law or statutory rights, duties, or liabilities of employers and employees under any law with respect to injuries, diseases, or death of employees arising out of, or in the course of, employment,'" *id.* (quoting 29 U.S.C. § 653(b)(4)); and (2) "Section 18(a) provides that the Act does not 'prevent any State agency or court from asserting jurisdiction under State law over any occupational safety or health issue with respect to which no [federal] standard is in effect.'" *Id.* at 96–97 (quoting 29 U.S.C. § 667(a)).

There are no federal standards in effect governing the COVID-19 protocols at JFK8 that Plaintiffs challenge in their amended complaint. And even where there may be some overlap between

43

agency and court action, overlap alone does not justify invoking the primary jurisdiction doctrine, *see Goya Foods*, 846 F.2d at 850 (concluding that "the pendency of a [Patent and Trademark Office] proceeding was not a proper basis to forestall [the plaintiff's] lawsuit"), especially where the agency's organic statute permits a parallel enforcement scheme, as is the case here with the OSH Act, *see, e.g., Nader*, 426 U.S. at 299–302 (concluding that the common law tort action for fraudulent misrepresentation and the Federal Aviation Act "are not 'absolutely inconsistent' and may coexist").

Moreover, even if OSHA's vaccination and testing ETS were still in effect, that ETS would not alter this conclusion, as a state occupational safety or health standard is only preempted to the extent that it is "inconsistent" *and* "relate[s] to the issues addressed by [the] ETS." 86 Fed. Reg. 61,402, 61,505. As the ETS said, "[s]tate and local requirements that ban or otherwise limit workplace vaccination, face covering, or testing clearly 'relate' to the occupational safety and

44

health 'issues' that OSHA is regulating in this ETS." 86 Fed. Reg. 61,402, 61,508; *see also Gade*, 505 U.S. at 99 ("The principal indication that Congress intended to pre-empt state law is § 18(b)'s statement that a State 'shall' submit a plan if it wishes to 'assume responsibility' for 'development and enforcement . . . of occupational safety and health standards *relating* to any occupational safety or health issue with respect to which a Federal standard has been promulgated.'" (emphasis added)). Plaintiffs' claims do not relate to those issues. Accordingly, there is no substantial risk of inconsistent rulings.

### d. Plaintiffs have not made a prior application to the agency

Finally, while not determinative, the fact that Plaintiffs have made no prior application to OSHA weighs against applying the doctrine of primary jurisdiction. "If prior application to the agency is *present*, this factor provides support for the conclusion that the doctrine of primary jurisdiction is appropriate." *Ellis*, 443 F.3d at 89 (emphasis added); *see also Golden Hill Paugussett Tribe of Indians*, 39

F.3d at 60 (concluding deferral to the agency was "fully warranted . . . where the plaintiff has already invoked the BIA's authority"). Thus, "if prior application to the agency is *absent*, this factor may weigh against referral of the matter to the agency." *Ellis*, 443 F.3d at 89 (emphasis added); *see also Schiller*, 449 F.3d at 295 (noting how, ordinarily, the fact that "the party challenging the agency action . . . made no prior application to the agency," would "weigh against primary jurisdiction"). The fourth *Ellis* factor, in other words, seeks to accomplish one of the doctrine's central aims: "to ensure that courts and agencies with concurrent jurisdiction over a matter do not work at cross-purposes." *Fulton Cogeneration Assocs.*, 84 F.3d at 97. Here, there is no pending proceeding before the agency, and there is no indication that the agency is poised to take up the specific questions before us, meaning that there is minimal, if any, concern that a court will resolve Plaintiffs' claims and fashion a remedy in a way that would work at a "cross-purpose" with OSHA's actions.

## 2.     Balancing the advantages and the costs

In deciding whether to apply the primary jurisdiction doctrine, we must also "balance the advantages of applying the doctrine against the potential costs resulting from complications and delay in the administrative proceedings." *Ellis*, 443 F.3d at 83 (internal quotation marks omitted). We conclude that the potential costs would outweigh the advantages. Given OSHA's understandable prioritization during the COVID-19 pandemic of the healthcare sector and the issuance of nationwide mandates such as vaccination requirements for certain private employers, it is not apparent that OSHA is likely, as a policy matter, to shift gears and prioritize developing more general workplace COVID-19 safety standards—much less standards that would provide meaningful guidance with respect to Amazon's JFK8 facility. We discern that abstention in favor of action by OSHA has the potential to delay this litigation, without any likelihood of countervailing advantages.

In sum, we conclude that the district court erred in abstaining

47

based on the primary jurisdiction doctrine.

**C.    Plaintiffs do not plausibly plead a special injury to support a public nuisance claim against Amazon**

The district court properly dismissed Plaintiffs' public nuisance claim because Plaintiffs fail to allege special injury. Under New York law, "[a] cause of action for public nuisance 'exists for conduct that amounts to a substantial interference with the exercise of a common right,' such as 'endangering' the 'health[ or] safety . . . of a considerable number of persons.'" *Benoit*, 959 F.3d at 504 (quoting *532 Madison Ave.*, 96 N.Y.2d at 292). A private person has a cause of action for public nuisance "only if it is shown that the person suffered special injury beyond that suffered by the community at large." *Id.* at 505 (internal quotation marks omitted). "The injury must be different in 'kind,' not simply 'degree.'" *Id.* (quoting *532 Madison Ave.*, 96 N.Y.2d at 293–94). It therefore is not enough that a private person "has suffered the same kind of harm or interference but to a greater extent or degree." *Am. Elec. Power Co.*, 582 F.3d at 367 (quoting

48

Restatement (Second) Torts § 812C, cmt. b). The Restatement (Second) of Torts provides helpful insight into the rule that a private person must suffer a special injury to state a claim for public nuisance. Comment a to Section 821C states that "it is uniformly agreed that a private individual has no tort action for the invasion of the purely public right, unless his damage is to be distinguished from that sustained by other members of the public."

Plaintiffs argue that "Amazon's maintenance of an unsafe work environment causes a different kind of harm to Plaintiffs because it is a direct affront to their health and safety in their homes and workplaces." Plaintiffs Br. at 34. Plaintiffs contend that, unlike members of the public at large, who can protect themselves from the virus by avoiding public places, they lack the autonomy to avoid the reach of Amazon's conduct since they cannot avoid JFK8 or their homes. According to Plaintiffs, they have "no meaningful choice but to subject themselves to Amazon's misconduct." *Id.* at 38.

Amazon counters with the argument that "everyone in New York who goes to work, the grocery store, or anywhere else risks being 'directly exposed' to COVID-19. The physical, emotional, and financial harms visited on New York by the virus are common to the entire community, not unique to Plaintiffs." Amazon Br. at 40. And with respect to the Non-Employee Plaintiffs, Amazon argues that they experience the "same kind of risk that all New Yorkers face when a family member interacts with others in the community, either by going to work, shopping at a grocery store, or having a service technician or other person visit their home." *Id.* at 41. Although we do not discount the risks Plaintiffs allege they face nor the harms Plaintiffs allege they experience, we agree with Amazon that Plaintiffs' alleged harms are different in degree, not in kind, and so do not make out the requisite special injury to state a claim for public nuisance.[4]

---

[4] To claim that their harm is different in kind and not merely degree,

Similarly, Plaintiffs' allegations that they have suffered financial losses, including lost wages, because they have avoided work as a result of Amazon's workplace safety practices, fail to meet the special injury requirement. Again, because of the pandemic, the public at large has suffered the same kind of harm—often devastating financial losses—that Plaintiffs allege. In fact, Plaintiffs agree that "the New York economy has been hard-hit by the pandemic." App'x at 82. Like Plaintiffs, many other residents of New York have forgone attending work because of a generalized risk of contracting COVID-

---

Plaintiffs rely on the Ninth Circuit's decision in *Ileto v. Glock*, 349 F.3d 1191 (9th Cir. 2003). Plaintiffs Br. at 37. There, the Ninth Circuit concluded that the plaintiffs sufficiently alleged that they "suffered an injury, namely trauma resulting from an assault with a gun and gun shot wounds, different in kind" from the injuries experienced by the general public. *Ileto*, 349 F.3d at 1212 (internal quotation marks omitted).

Plaintiffs' reliance on *Ileto* is misplaced. As shooting victims, the *Ileto* plaintiffs alleged harms (gunshot wounds and trauma) different in kind from the generalized fear and anxiety the plaintiffs alleged that the public experienced following the shooting. *Id.* at 1211–12. Without expressing any view on the correctness of the Ninth Circuit's decision, we conclude that Plaintiffs here have not alleged any analogous harm. Regardless of whether a person works at JFK8, is a member of a JFK8 employee's household, or is a member of the public at large, the alleged harm remains the same: an interference with one's health and safety—whether through contracting the virus or through fear of contracting the virus.

51

19. And as New York courts have made clear, when "pecuniary damages are 'so general and widespread as to affect a whole community, or a very wide area within it,'" that injury is the same in kind. *532 Madison Ave.*, 96 N.Y.2d at 293.

Plaintiffs compare their situation to that of the plaintiff-homeowners in *Fresh Air for the Eastside, Inc. v. Waste Mgmt. of New York*, 405 F. Supp. 3d 408 (W.D.N.Y. 2019), who owned property near a noxious landfill. *See* Plaintiffs Br. 34. Plaintiffs effectively assert that their inability to avoid their workplaces and their homes is akin to the *Fresh Air* plaintiffs' "inability to fully utilize their homes" and the diminution in value of their homes resulting from living adjacent to a noxious landfill. 405 F. Supp. 3d at 442. But in the case of the noxious landfill, the plaintiffs' special injury arose from the landfill's interference with their property rights, not from a lack of autonomy over leaving their homes. *Id.* Here, the public at large shares in the risk of contracting COVID-19, regardless of property ownership and

employment.  As the district court correctly concluded, the general public cannot avoid the risk of exposure to COVID-19 "simply by avoiding JFK8, its immediate surrounding area, and its employees." App'x at 140.

To be sure, in *Connecticut v. American Electric Power Co, Inc.*, our Court suggested that "[d]ifference in degree . . . as a measure of a different kind of harm, is not entirely out of the picture." 582 F.3d at 368.  This statement relied on comment c to § 821C of the Restatement (Second) of Torts, which provides that "[d]ifference in degree of interference cannot . . . be entirely disregarded in determining whether there has been difference in kind."  The comment provides an example:

> Normally there may be no difference in the kind of interference with one who travels a road once a week and one who travels it every day.  But if the plaintiff traverses the road a dozen times a day he nearly always has some special reason to do so, and that reason will almost invariably be based upon some special interest of his own, not common to the community.  Significant interference with that interest may be particular damage,

> sufficient to support the action in tort. . . . Thus in determining whether there is a difference in the kind of harm, the degree of interference may be a factor of importance that must be considered.

But in *American Electric Power Co.* we did not need to "demarcate the outer limits of § 821C(1)'s requirement that the harms be different in kind (sometimes called 'special injury'), because the harms asserted by the [plaintiffs] qualif[ied]" as a special injury (i.e., a harm that was different in *kind*). 582 F.3d at 368. We thus did not go so far as to hold that the degree of a plaintiff's harm plays a part in determining whether that harm is different in kind. And because Plaintiffs' asserted injury from COVID-19 exposure is not so markedly greater in degree than that faced by large numbers of the public, we likewise decline to reach that question today.

**D.    The New York Workers' Compensation Law does not bar claims for injunctive relief under NYLL § 200**

Amazon argues that the New York Workers' Compensation Law ("NYWCL") precludes Plaintiffs' claims for injunctive relief under New York Labor Law ("NYLL") § 200. We disagree.

54

The New York Court of Appeals has not yet had the opportunity to decide this question of New York law, so our task is to predict how it would rule. *See In re Brooklyn Navy Yard Asbestos Litig.*, 971 F.2d 831, 850 (2d Cir. 1992). And where the highest court of the state has not spoken, "the best indicators of how it would decide are often the decisions of lower state courts." *Id.* Here, the text, history, and underlying purposes of the NYWCL, coupled with relevant precedent from New York's intermediate courts, enable us to predict what the New York Court of Appeals would hold: the NYWCL's exclusivity provision does not bar claims for injunctive relief under NYLL § 200.

Construing New York law, "[o]ur analysis begins with the language of the statute." *People v. Francis*, 30 N.Y.3d 737, 745 (2018). In addition to statutory language itself, the specific context in which statutory language is used and the broader context of the statute as a whole assist the court in ascertaining the text's plain meaning. *See*

55

*Scott v. Mass. Mut. Life Ins. Co.*, 86 N.Y.2d 429, 435 (1995); *see also*

*Albano v. Kirby*, 36 N.Y.2d 526, 530 (1975) ("No rule of construction . . .

permits the segregation of a few words from their context and from

all the rest of the section or rule . . . ."). And "[l]iteral meanings of

words are not to be adhered to or suffered to 'defeat the general

purpose and manifest policy intended to be promoted'" by a given

statute. *Council of City of New York v. Giuliani*, 93 N.Y.2d 60, 69 (1999)

(quoting *People v. Ryan*, 274 N.Y. 149, 152 (1937)).

In this case, we must ascertain the plain meaning of both NYLL

§ 200 and NYWCL § 11. NYLL § 200 outlines the general duty of

employers to safeguard their employees' well-being by providing

"reasonable and adequate protection to [their] lives, health and

safety" in the workplace. As NYLL § 200 is "a codification of the

common-law duty to provide workers with a safe work

environment," it essentially codifies a claim for common law

negligence. *Everitt*, 285 A.D.2d at 443; *In re World Trade Ctr. Lower*

56

*Manhattan Disaster Site Litig.*, 758 F.3d at 210 ("Codifying common law negligence, New York Labor Law § 200 provides for a general duty to protect the health and safety of employees.").

The NYWCL focuses on monetary compensation for workers' injuries. Section 10 requires that an employer "secure compensation to his employees and pay or provide compensation for their disability or death from injury arising out of and in the course of the employment." And section 11 clarifies that this liability "shall be exclusive and in place of any other liability whatsoever, to such employee . . . entitled to recover damages, contribution or indemnity, at common law or otherwise, on account of such injury or death or liability arising therefrom . . . ."

To argue that the NYWCL bars Plaintiffs' claims, Amazon relies on the language in NYWCL § 11 providing that the law is exclusive of "any other liability whatsoever." This language, Amazon contends, illustrates that section 11 protects "employers from *suit*,"

including suits in both law and equity. Amazon Br. at 48 (internal quotation marks omitted). Plaintiffs, on the other hand, interpret the exclusivity provision to preclude employees from seeking damages, but not injunctive relief, from employers under NYLL § 200.[5]

The text of NYWCL § 11 supports Plaintiffs' interpretation. Namely, the language Amazon cites—"any other liability whatsoever"—cannot be divorced from the monetary awards listed later in the same sentence: "damages, contribution, or indemnity." N.Y. Workers' Comp. Law § 11 (McKinney 2017); *see Albano*, 36 N.Y.2d at 530; *see also King v. Time Warner Cable Inc.*, 894 F.3d 473, 477 (2d Cir. 2018) ("[W]ords to be interpreted are not considered in isolation."); *City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384, 401 (2d Cir. 2008) ("[W]here specific words follow a general word, the

---

[5] As a threshold matter, we do not find it necessary to separate Plaintiffs' arguments under NYLL § 200 into distinct backward- and forward-looking claims. Plaintiffs asked the district court to enjoin Amazon from continuing with its alleged breach of duty under NYLL § 200. That Plaintiffs cite both past and ongoing conduct to support their need for injunctive relief does not require us to split their single claim in two.

specific words restrict application of the general term to things that are similar to those enumerated." (internal quotation marks omitted)). That list of monetary awards confirms that the "liability" referenced in the NYWCL's exclusivity provision is confined to claims for retrospective damages and does not encompass claims for injunctive relief.

The NYWCL's legislative history and New York appellate court cases further demonstrate that the NYWCL seeks to balance the *monetary* interests of employers and employees, while the NYLL focuses more on regulating employers' conduct. *See, e.g., Acevedo v. Consolidated Edison Co. of New York, Inc.*, 189 A.D.2d 497, 502–03 (1st Dep't 1993) ("The courts of this state have long held that, if an injury or disease is covered in any way by Workers' Compensation, recovery *at law* for a particular type of damage resulting from that injury or disease, even though not compensable, will also be barred." (emphasis added)); *Huston v. Hayden Bldg. Maintenance Corp.*, 205

59

A.D.2d 68, 71 (2d Dep't 1994) ("In our view the primary purpose of the [NYLL] is to regulate conduct.").

The NYWCL was adopted pursuant to a 1913 amendment to New York's constitution, which provided that the legislature could "fix the right to compensation to be paid by an employer for death resulting to an employee for injuries received in the course of his employment," and that "the right of such compensation, and the remedy therefor *shall be exclusive of all other rights and remedies*." *Shanahan v. Monarch Eng'g Co.*, 219 N.Y. 469, 475–76 (1916) (quoting 1913 constitutional amendment). When promulgating the NYWCL, the New York legislature thereby created a scheme in which both employer and employee "gained benefits and made concessions." *Id.* at 478.

As part of this tradeoff, the employee receives "the security of knowing that fixed benefits will be paid," but forgoes the possibility of "a more substantial recovery through a jury award." *Dumervil v.*

60

*Port Auth. of N.Y. & N.J.*, 163 A.D.3d 628, 629 (2d Dep't 2018).  The employer is on the hook for "no-fault liability," but is protected from the "large damage verdicts which the statute was intended to foreclose." *Reich v. Manhattan Boiler & Equip. Corp.*, 91 N.Y.2d 772, 780 (1998); *see also Shanahan*, 219 N.Y. at 477 (noting that part of the tradeoff between employers and employees includes an employer not needing to defend against "unjust or excessive claims").

In other words, the legislature was concerned primarily with the predictability of monetary compensation when adopting the NYWCL.  *See Werner v. State*, 53 N.Y.2d 346, 353 (1981) ("[T]he obvious purpose of those provisions [is] to foreclose the possibility of duplicative recoveries.").[6]  Had the legislature intended to extend the NYWCL's exclusivity provision to injunctive relief as well, it could

---

[6] Here, there is no risk of duplicative recoveries because the Workmen's Compensation Board cannot issue the remedy Plaintiffs seek—an injunction compelling Amazon to cease the conduct alleged as jeopardizing the health and safety of employees during the COVID-19 pandemic.  *See* N.Y. Workers' Comp. Law § 142 (outlining the Board's "[g]eneral powers and duties").

have so provided, and so altered the tradeoff for both employers and employees. In the absence of such a statement from the legislature, however, we decline to extend the exclusivity provision's reach.

**E.    COVID-19 leave payments are not "wages" under NYLL § 191**

Lastly, Plaintiffs cannot state a claim for a violation of NYLL § 191 because, as the district court correctly concluded, COVID-19 leave payments are not "wages" as defined by § 191.

NYLL § 191 outlines the frequency with which an employer shall pay an employee "wages." Wages are defined as "the earnings of an employee for labor or services rendered, regardless of whether the amount of earnings is determined on a time, piece, commission or other basis." N.Y. Lab. Law § 190(1) (McKinney 2008). For purposes of NYLL § 191, the term "wages" does not include "benefits or wage supplements." *Id.* Benefits or wage supplements include "reimbursement for expenses; health, welfare, and retirement benefits; and vacation, separation or holiday pay." *Id.* § 198-c(2),

62

*preempted on other grounds by* 75 A.D.3d 755 (3d Dep't 2010). And New York's Leave Law "provid[es] requirements for sick leave and the provision of certain employee benefits when such employee is subject to a mandatory or precautionary order of quarantine or isolation due to COVID-19." 2020 N.Y. Sess. Laws ch. 25, § 1.1.(a) (McKinney).

Plaintiffs argue that excepting COVID-19 sick leave from NYLL § 191's "frequency-of-pay provisions" for wages would undermine the Leave Law's purpose because the "[p]romise of wages at some unspecified future date is unlikely to convince a potentially infected worker to self-isolate if that worker is subsisting week-to-week." Plaintiffs Br. at 52. But the New York legislature, well aware that NYLL § 191 explicitly excludes benefits or wage supplements from its provisions, described the purpose of the Leave Law as "providing requirements for sick leave and the provision of certain employee benefits." 2020 N.Y. Laws 8091.

Moreover, COVID-19 sick leave need not be subject to NYLL

63

§ 191's pay frequency requirements to serve as an "effective tool[] at protecting public health." Plaintiffs Br. at 51. Plaintiffs still have a form of redress available under the Leave Law: they can file a complaint with the New York Department of Labor (the "NYDOL"). N.Y. State, Dep't of Labor, *COVID-19 Complaint*, https://forms.ny.gov/s3/Department-of-Labor-COVID-19-Complaint (last visited October 14, 2022).

Plaintiffs next assert that COVID-19 sick leave payments are "wages" for purposes of NYLL § 191 because the pay is a statutory entitlement rather than an "ancillary benefit or wage supplement" created by employment contract. Plaintiffs Br. at 54. As we explained in *Myers v. Hertz Corp.*, however, "plaintiffs may not use Labor Law § 191 to seek unpaid wages to which they claim to be entitled under a statute; rather § 191 guarantees only that the wages the employer and employee have 'agreed' upon be paid in a 'timely' manner again according to the 'terms of [the employee's] employment." 624 F.3d

64

537, 545 n.1 (2d Cir. 2010) (quoting N.Y. Lab. Law § 191).

We also reject Plaintiffs' contention that the district court improperly ignored the NYDOL's Frequently Asked Questions (the "FAQ") concerning COVID-19 sick leave. In pertinent part, the FAQ explains that "[t]he paid COVID-19 sick leave payments are subject to the frequency of pay requirements of Section 191." N.Y. State, *New York Paid Family Leave COVID-19: Frequently Asked Questions* [hereinafter Paid Family Leave FAQs], https://paidfamilyleave.ny.gov/new-york-paid-family-leave-covid-19-faqs (last visited October 14, 2022). Plaintiffs apparently take this to mean that COVID-19 sick leave payments are wages for purposes of NYLL § 191. But as the State of New York explained in its *amicus* brief, that FAQ is not guidance regarding NYLL § 191, but more a "shorthand to explain that the new quarantine leave payments should be made on the same schedule and in the same manner as wages subject to Labor Law § 191." State of New York, *Amicus Curiae* Br. at

65

24.

Even if the NYDOL's FAQ page were a more formal, authoritative agency pronouncement entitled to deference, it more strongly suggests that COVID-19 leave payments are benefits, not wages. The FAQ does not state that Leave Law payments are "wages" as defined by § 191. Nor does the FAQ advise that an employer violates § 191 if it fails to make Leave Law payments per § 191's schedule. Rather, the FAQ suggests that COVID-19 leave payments are benefits. In the very same FAQ upon which Plaintiffs rely, the NYDOL titles a section "Benefits" and repeatedly uses the word thereafter to explain what pay an individual is entitled to under the Leave Law when subject to an order of quarantine or isolation. *See, e.g.*, *Paid Family Leave FAQs* ("How does this affect NY's COVID-19 quarantine leave *benefits*? . . . NY's COVID-19 quarantine leave *benefits* are only available during the order of quarantine or isolation. . . . This new law provides *benefits* in cases where an individual is

under an order of quarantine – either mandatory or precautionary. . . ." (emphasis added)).

Furthermore, in describing COVID-19 workplace regulations, the NYDOL states the following:

> Former Governor Cuomo enacted a law that provides benefits – including sick leave, paid family leave, and disability benefits – to New York employees impacted by the mandatory or precautionary orders of quarantine or isolation due to COVID-19. These benefits do not have an expiration date. If your employer does not comply with this law, you have the right to file a complaint.

N.Y. State, Dep't of Labor, *COVID-19 Paid Sick Leave*, https://dol.ny.gov (last visited October 14, 2022).

An agency's interpretation of a statute "is entitled to great deference, particularly when that interpretation has been followed consistently over a long period of time." *United States v. Clark*, 454 U.S. 555, 565 (1982). As the district court explained, the NYDOL has consistently instructed that paid sick leave is a "benefit[]" and that there is "'no "correct" or prescribed method' of provision or payment." App'x at 149–50.

67

Finally, Plaintiffs do not perform any labor at JFK8 while under mandatory or precautionary COVID-19 quarantine or isolation. Therefore, the payments Plaintiffs are entitled to receive under the Leave Law cannot be "wages" under NYLL § 191. *See* N.Y. Lab. Law § 190(1) (defining "wages" as "earnings for labor or services rendered"). And because payments provided for under the Leave Law are not "wages" for purposes of NYLL § 191, Plaintiffs do not have a claim under NYLL § 191 for Amazon's alleged violations of the Leave Law.

## III. CONCLUSION

In sum, we hold as follows:

(1)     Plaintiffs' public nuisance and NYLL § 200 claims are not moot.

(2)     The doctrine of primary jurisdiction does not apply to Plaintiffs' public nuisance or NYLL § 200 claims.

(3)     Plaintiffs fail to state a claim for public nuisance under New York law because they do not allege a special injury.

(4)     Section 11 of the New York Workers' Compensation Law does not preclude injunctive relief under NYLL § 200.

(5)     Leave Law payments are not "wages" for purposes of NYLL § 191.

We therefore AFFIRM the district court's dismissal of Plaintiffs' public nuisance claim and NYLL § 191 claims for damages and injunctive relief; and we VACATE the district court's dismissal of Plaintiffs' NYLL § 200 claim seeking a declaratory judgment and injunctive relief and REMAND to the district court for further proceedings on that claim.

DENNY CHIN, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority's holdings that (1) Plaintiffs' public nuisance and New York Labor Law ("NYLL") § 200 claims are not moot, (2) the primary jurisdiction doctrine does not apply to those claims, (3) § 11 of the New York Workers' Compensation Law does not preclude injunctive relief under NYLL § 200, and (4) COVID-19 sick leave payments are not "wages" under NYLL § 191.  I respectfully dissent, however, from the majority's conclusion that the district court properly dismissed Plaintiffs' public nuisance claim.  I would find that the harm Plaintiffs faced was different in kind -- not just degree -- from that faced by the community at large.  Accordingly, I would conclude that Plaintiffs adequately pleaded special injury to support their public nuisance claim.

Under New York law, "[a] cause of action for public nuisance 'exists for conduct that amounts to a substantial interference with the exercise of a common right,' such as 'endangering' the 'health or safety of a considerable number of persons.'"  *Benoit v. Saint-Gobain Performance Plastics Corp.*, 959 F.3d 491, 504 (2d Cir. 2020) (alterations omitted) (quoting *532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.*, 96 N.Y.2d 280, 292 (2001)).  "A 'public nuisance is actionable by a private person only if it is shown that the person suffered special

injury beyond that suffered by the community at large.'" *Id.* at 505 (quoting *532 Madison Ave. Gourmet Foods, Inc.*, 96 N.Y.2d at 292). "The injury must be different in 'kind,' not simply 'degree.'" *Id.* (quoting *532 Madison Ave. Gourmet Foods, Inc.*, 96 N.Y.2d at 294); *see Connecticut v. Am. Elec. Power Co., Inc.*, 582 F.3d 309, 367 (2d Cir. 2009) ("It is not enough that he has suffered the same kind of harm or interference but to a greater extent or degree."), *rev'd on other grounds*, 564 U.S. 410 (2011). As the majority acknowledges, however, a "[d]ifference in degree of interference cannot . . . be entirely disregarded in determining whether there has been difference in kind." Restatement (Second) of Torts § 821C, cmt. c.

The majority observes that because all New Yorkers faced the risk of contracting COVID-19, any injury suffered by Plaintiffs is one of a difference only in degree, not in kind. I disagree. Plaintiffs are not alleging that the generalized risk of contracting COVID-19 constitutes a public nuisance, but rather that Amazon's conduct created a public nuisance that disproportionately injured them. First, Plaintiffs faced heightened COVID-19 risks due to the conditions of their employment. Second, they risked financial losses if they dared to mitigate those conditions. The harms here -- employment conditions and financial losses -- are different in kind from those the public faced because

2

the community at large was not subjected to the conditions that the workers at JFK8 endured. The public at large did not even enter JFK8.

As alleged in the amended complaint (and assumed to be true for purposes of this appeal), Plaintiffs faced conditions that significantly increased their risk of contracting COVID-19 and were forced to face these heightened risks under threat of discipline or termination. Amazon's demanding productivity requirements at JFK8, an 840,000 square foot fulfillment center on Staten Island,[1] prevented workers from engaging in social distancing or basic hygiene and sanitation practices. *See, e.g.*, J. App'x at 108 ¶ 250 (workers "fear taking the time to clean their stations for fear it will result in a writeup for [productivity] issues); *id.* at 109 ¶ 253 (because of changes to employee break schedules, "bathroom lines and break rooms are more crowded during the break time").

Moreover, Amazon implemented a contact-tracing plan that was effectively inoperative, discouraged employees from informing their colleagues if they had tested positive, and penalized workers who raised concerns about the lack of COVID-19 safety protocols at the warehouse. *See, e.g.*, J. App'x at 111

---

[1] JFK8 operates 24 hours, seven days a week. On average, there are approximately 3,500 workers at one time, but during peak seasons around the holidays or Amazon Prime Day in July, this number can increase to 5,000 workers. *See* J. App'x at 88 ¶ 86; 127-28.

¶ 280 (Amazon's contact tracing system consisted "entirely of reviewing surveillance footage to monitor the workplace contacts of workers diagnosed with COVID-19"); *id.* at 113 ¶ 290 (workers who tested positive were discouraged from telling their coworkers and were given no guidance on how to "monitor their health at home, quarantine when not at work, or to seek medical advice").

Though Amazon suspended the tracking requirements for the "total time off task" ("TOT") system in March 2020, workers were not informed until July 2020. *See id.* at 106 ¶¶ 232-33 (Amazon instructed managers "not to post the talking points [about the change in TOT rate enforcement] publicly"). Until then, the strict TOT system and the risk of termination forced Plaintiffs to continue working in conditions that rendered them particularly susceptible to COVID-19. *See, e.g., id.* at 107 ¶ 238 (the TOT system "forced [workers] to work at a frenzied pace"); *id.* at 108 ¶ 245 (the productivity requirements "discourage[d] workers from leaving their workstations to wash their hands and from taking the time to wipe down their workstations").

Plaintiffs plausibly alleged that the threat of discipline or termination if they failed to meet their productivity requirements kept them confined to the hazardous environment inside JFK8. Warehouse workers were at

4

particular risk of contracting COVID-19. First, warehouses often contained thousands of employees working in "cramped or tight spaces" at high work rates and talking at elevated volumes to overcome the din of machinery. Br. of Amici Curiae Occupational Health Physicians et al. in support of Plaintiff-Appellants ("Br. of Amici Curiae") at 3-4. Such conditions increased the risk of transmission of an airborne virus such as COVID-19 because employees were discouraged from leaving their workstations to sanitize themselves after each potential exposure. *Id.* This heightened risk was exacerbated where, as here, workers were deprived of preventative safety measures and were unable to easily access sick leave, resulting in an increased risk of infecting their coworkers and families.

Plaintiffs lacked the autonomy to avoid the hazardous conditions arising from Amazon's conduct. And unlike many members of the public, Plaintiffs were not permitted to work remotely. If anything, because the demand for packages increased during the pandemic, they had even less flexibility in that respect. *See, e.g.*, J. App'x at 88 ¶ 87 (Amazon said it hired 175,000 new workers in April 2020, many of whom were "temporary workers hired to meet increased demand during the pandemic").

At the end of each nearly 11-hour shift working under these conditions, Plaintiffs would then take the increased risk of infection home to their families. While Amazon may have created an indirect harm to the public in the form of community spread, its practices directly endangered Plaintiffs in the workplace and further endangered the communities with whom Plaintiffs interacted. *See* Br. of Amici Curiae at 24. Plaintiffs Chandler and Bernard contracted COVID-19 while working at JFK8, and Chandler's cousin, with whom she lived, died during that time from the disease. The physical and emotional injuries that followed were distinct from those the community faced because they arose proximately from Amazon's conduct.

Plaintiffs also suffered economic harm not suffered by members of the public because they faced loss of pay and sick leave. *See, e.g.*, J. App'x at 92 ¶¶ 120-24 (workers felt "increased pressure to attend work while sick" because they feared losing the opportunity to accrue limited unpaid leave time); *id.* at 89 ¶ 98 (Amazon retaliated against workers who spoke out about workplace safety and COVID-19). New York courts have long recognized that economic harm can be a sufficient special injury for a private plaintiff to maintain a public nuisance claim. *See 532 Madison Ave. Gourmet Foods, Inc.*, 96 N.Y.2d at 293 (private right of

6

action where public nuisance "had a devastating effect on [plaintiffs'] ability to earn a living"). Further, "[o]n the matter of special damage . . . there is no requirement that there be directness of such damage, or that there be any particular quantum, before there is a right to a private remedy, such as injunction." *Graceland Corp. v. Consol. Laundries Corp.*, 180 N.Y.S.2d 644, 648 (1958), *aff'd*, 6 N.Y.2d 900 (1959). Defendants made it difficult for workers who tested positive for COVID-19 to obtain sick leave and allegedly did not pay the full amount of COVID-19 sick pay.

Constrained by the demanding requirements of the TOT system, Plaintiffs were faced with an unenviable choice: continue working in a dangerous and demanding work environment or avoid it to protect their health but face a high likelihood of losing their jobs. Although it is true, as the majority observes, that many New Yorkers suffered financial losses as a result of the pandemic, the losses Plaintiffs allege are different in kind because they resulted from Amazon's affirmative decisions not to implement any sufficient measures to mitigate the high risk of COVID-19 transmission inherent in warehouse work. *See, e.g.*, Br. of Amici Curiae at 7 (due to "certain environmental design characteristics that make social distancing difficult [in warehouses], . . . it [is] all

7

the more important that employers implement all mitigation measures to prevent COVID-19 infection.").

Plaintiffs have thus plausibly pleaded special injury that they faced a heightened risk of exposure to COVID-19 and threat of economic harm because of conditions at JFK8. Thus, I would hold that the lower court erred in dismissing Plaintiffs' public nuisance claim.