*Neurological Surgery v. Dep't of Health & Human Servs.*

# In the
# United States Court of Appeals
## For the Second Circuit

August Term, 2024
No. 24-1884

NEUROLOGICAL SURGERY PRACTICE OF LONG ISLAND, PLLC,
*Plaintiff-Appellant,*

*v.*

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES,
UNITED STATES DEPARTMENT OF THE TREASURY, UNITED STATES
DEPARTMENT OF LABOR, ROBERT F. KENNEDY, JR., in his official
capacity as Secretary, United States Department of Health and
Human Services, SCOTT BESSENT, in his official capacity as Secretary,
United States Department of the Treasury, LORI CHAVEZ-DEREMER,
in her official capacity as Secretary, United States Department of
Labor,
*Defendants-Appellees.*[*]

On Appeal from a Judgment of the United States District Court for
the Eastern District of New York.

ARGUED: MAY 15, 2025

---

[*] The Clerk of Court is directed to amend the official caption to conform
with the above.

DECIDED: JULY 22, 2025

Before: CALABRESI, BIANCO and NARDINI, *Circuit Judges*.

_____

Plaintiff-Appellant Neurological Surgery Practice of Long Island, PLLC ("Neurological Surgery") is a healthcare provider that provides out-of-network medical services that are governed by the No Surprises Act. The Act mandates that out-of-network healthcare providers, like Neurological Surgery, may not bill patients for certain items or services directly and must instead seek compensation from the patient's healthcare plan. If a provider and a healthcare plan cannot agree on an appropriate compensation amount, the Act provides for an independent dispute resolution ("IDR") process in which a certified private arbitrator selects between compensation proposals submitted by the parties. Defendants-Appellees—the United States Department of Health and Human Services, Department of the Treasury, Department of Labor, and the Secretaries of those agencies (collectively, the "Departments")—are charged with implementing and administering the Act.

Neurological Surgery alleges that since the Act was implemented, a backlog of disputes awaiting resolution has accumulated and that it has consequently suffered substantial harm in the form of unpaid or delayed reimbursement from healthcare plans. It alleges that these delays are the result of the Departments' failure to lawfully implement the Act, in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, and Due Process Clause of the Fifth Amendment. The United States District Court for the Eastern District of New York (Brian M. Cogan, *District Judge*) dismissed Neurological Surgery's claims. Neurological Surgery now appeals and asks us to vacate the district court's judgment, disputing its conclusions that: (i) Neurological Surgery's

claims have been rendered moot by the reopening of the portal used by providers to initiate IDR proceedings; (ii) Neurological Surgery lacks standing to compel the Departments to enforce the Act's deadlines for reimbursement on third parties; (iii) Neurological Surgery's claim that the Departments have failed to certify a sufficient number of arbitrators is foreclosed by the APA because the Act does not identify a discrete action that the Departments must take to comply with that mandate; and (iv) Neurological Surgery's claim that the Departments have failed to provide guidance on New York's surprise billing law is also foreclosed by the APA for the same reasons.

We substantially agree with the district court's conclusions. We therefore AFFIRM the judgment of the district court.

--------

ROY W. BREITENBACH, Harris Beach PLLC, Uniondale, NY, *for Plaintiff-Appellant*.

KEVIN B. SOTER (Brett A. Shumate, Acting Assistant Attorney General, Joshua M. Salzman, Sarah Clark Griffin, *on the brief*), Appellate Staff, Civil Division, U.S. Department of Justice, Washington, DC, *for Defendants-Appellees*.

--------

WILLIAM J. NARDINI, *Circuit Judge*:

Plaintiff-Appellant Neurological Surgery Practice of Long Island, PLLC ("Neurological Surgery") is a healthcare provider that provides out-of-network medical services that are governed by the No Surprises Act. *See* Pub. L. No. 116-260, div. BB, tit. I, 134 Stat. 1182,

3

2758–890 (2020), codified at 42 U.S.C. § 300gg-111 *et seq*.  The Act mandates that out-of-network healthcare providers, like Neurological Surgery, may not bill patients for certain items or services directly and must instead seek compensation from the patient's healthcare plan. If a provider and a healthcare plan cannot agree on an appropriate compensation amount, the Act provides for an independent dispute resolution ("IDR") process in which a certified private arbitrator selects between compensation proposals submitted by the parties. Defendants-Appellees—the United States Department of Health and Human Services, Department of the Treasury, Department of Labor, and the Secretaries of those agencies (collectively, the "Departments")—are charged with implementing and administering the Act.

Neurological Surgery alleges that since the Act was implemented, a backlog of disputes awaiting resolution has accumulated and that it has consequently suffered substantial harm in the form of unpaid or delayed reimbursement from healthcare plans.  It alleges that these delays are the result of the Departments' failure to lawfully implement the Act, in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, and the Due Process Clause of the Fifth Amendment.  The United States District Court for the Eastern District of New York (Brian M. Cogan, *District Judge*) dismissed Neurological Surgery's claims.  Neurological Surgery now appeals and asks us to vacate the district court's judgment, disputing its conclusions that: (i) Neurological Surgery's claims have been rendered moot by the reopening of the portal used

4

by providers to initiate IDR proceedings; (ii) Neurological Surgery lacks standing to compel the Departments to enforce the Act's deadlines for different stages of the IDR process on third parties; (iii) Neurological Surgery's claim that the Departments have failed to certify a sufficient number of arbitrators is foreclosed by the APA because the Act does not identify a discrete action that the Departments must take to comply with that mandate; and (iv) Neurological Surgery's claim that the Departments have failed to provide guidance on New York's surprise billing law is also foreclosed by the APA for the same reasons.

We substantially agree with the district court's conclusions. First, we conclude that although one of Neurological Surgery's claims challenging the closure of the portal is moot, we disagree with the district court that the reopening of the portal mooted Neurological Surgery's remaining claims. Second, we hold that Neurological Surgery lacks standing to compel the Departments to enforce the Act's deadlines for reimbursement on third parties, namely healthcare plans and arbitrators. We read Neurological Surgery's complaint to suggest its injury has been caused by the actions of healthcare plans and arbitrators, not the Departments; it has therefore failed to establish standing to compel the Departments to take action. Next, we agree with the district court that Neurological Surgery's challenge to the Department's failure to certify a sufficient number of arbitrators is foreclosed by the APA, because the No Surprises Act does not prescribe discrete actions that the Departments must take in achieving that goal. And finally, we hold Neurological Surgery's

5

challenge to the Departments' failure to issue guidance on New York's surprise billing law fails to state a claim under the APA, because it fails to allege that doing so is a discrete agency action that the Departments are required to take.

We therefore AFFIRM the judgment of the district court.

## I. Statutory Background

On December 27, 2020, Congress passed the No Surprises Act to address the issue of patients facing unexpected—and often exceedingly large—medical bills after they received treatment from out-of-network providers. The Act "prohibits out-of-network health care providers from billing healthcare plan members directly for certain items or services." *Neurological Surgery Prac. of Long Island, PLLC v. United States Dep't of Health & Hum. Servs.*, 682 F. Supp. 3d 249, 255 (E.D.N.Y. 2023) (outlining the statutory framework of the Act). "A provider must instead seek compensation from the patient's healthcare plan." *Id.* "[U]pon receiving a request for payment from a provider, the patient's health care plan determines whether and in what amount it will pay for the services." *Id.* If the provider and healthcare plan cannot agree on a reimbursement amount, the Act provides for an IDR process in which a private third-party arbitrator ("IDR entity") selects between amounts submitted by the parties. *Id.*

The Act sets deadlines for various steps in the process. "A health care plan's initial payment decision must be made within 30 calendar days after the out-of-network provider transmits its bill to the health plan." *Id.* (citing 42 U.S.C. § 300gg-111(a)(1)(C)(iv)(I)). "If

6

there is a dispute between the healthcare plan and the provider regarding the proper compensation amount, there is a 30-day open negotiation period." *Id.* (citing 42 U.S.C. § 300gg-111(c)(1)(A)). If negotiations are unsuccessful, a party wishing to bring an IDR proceeding must do so within 4 days. 42 U.S.C. § 300gg-111(c)(1)(B). The parties must submit their compensation proposals within 10 days of selecting an IDR entity, and the IDR entity must then render a decision choosing one of the proposals within 30 days. *Id.* § 300gg-111(c)(5)(A) and (B). That decision is binding on the parties "in the absence of a fraudulent claim or evidence of misrepresentation of facts presented" and is subject to limited judicial review under the Federal Arbitration Act. *Id*. § 300gg-111(c)(5)(E). "A health care plan must pay any additional compensation ordered by the [IDR entity] to the provider within 30 days of the decision." *Neurological Surgery*, 682 F. Supp. 3d at 255 (citing 42 U.S.C. § 300gg-111(c)(6)).

The Act delegates to the Departments the task of devising the implementing regulations needed to make the program work. The Act directs the Departments to "establish by regulation one independent dispute resolution process . . . under which . . . a certified IDR entity . . . determines . . . the amount of payment" for services the Act covers. 42 U.S.C. § 300gg-111(c)(2)(A). Importantly, the Act also charges the Departments with the responsibility to "establish a process to certify (including to recertify) [IDR] entities." *Id.* § 300gg-111(c)(4)(A). The "process shall ensure that an entity so certified" meets various statutory requirements as to its expertise, staffing, and fiscal integrity, among other criteria. *Id.*; *see id.*

7

§ 300gg-111(c)(4)(A) (stating that IDR entities must, *inter alia*, have "sufficient medical, legal, and other expertise and sufficient staffing"; "meet[] appropriate indicators of fiscal integrity"; and "maintain[] the confidentiality . . . of individually identifiable health information"). In addition, the Act mandates that "[t]he process . . . shall ensure that a sufficient number of entities are certified . . . to ensure the timely and efficient provision of [payment] determinations." *Id.* § 300gg-111(c)(4)(E).

Before the enactment of the No Suprises Act, many states had passed their own laws to address the issue of so-called "surprise" medical billing. The Act defers to those pre-existing state programs and states that the federal IDR process created by the Act is not available when a "specified State law" provides a method to determine the total compensation amount payable under a healthcare plan. *Id.* § 300gg-111(a)(3)(H)–(I). As relevant here, New York has a surprise billing law (the "New York Surprise Bill Law") with an IDR process that predates the Act. *See* N.Y. Fin. Serv. Law §§ 601–608.

## II. Factual Background

Neurological Surgery is a private neurosurgery practice in New York that regularly provides out-of-network medical services to members of major healthcare plans. Since January 2022, when the No Surprise Act went into effect, Neurological Surgery's provision of these services has been governed by the Act.

Neurological Surgery alleges that since the Act has been implemented, a backlog of disputes awaiting resolution has

8

accumulated. For example, as of March 15, 2023, Neurological Surgery submitted 1,050 claims to IDR but only 204 have been decided. It maintains that these delays are the result of the Departments' failure to implement the Act, and that it has consequently suffered substantial harm in the form of unpaid or delayed reimbursement from healthcare plans. Specifically, Neurological Surgery contends that the Departments have failed to certify a sufficient number of IDR entities and compel healthcare plans and IDR entities to follow the deadlines set by the Act, resulting in long delays of the IDR process. Neurological Surgery asserts that the lack of timely reimbursement has placed it "in danger of financial collapse." Appellant Br. at 11. After Neurological Surgery filed the initial complaint in this case, the IDR process was paused for approximately two months in the early fall of 2023. The Departments had paused the IDR portal to implement changes to their procedures necessary to comply with a Texas district court's order, which "vacated portions of the regulations governing the IDR process, including the regulations setting forth the methodology for calculating qualifying payment amounts (one of the factors an IDR entity must consider in rendering a payment determination)." Appellee Br. at 10–11; *see Texas Med. Ass'n v. HHS*, No. 6:22-CV-450 (JDK), 2023 WL 5489028 (E.D. Tex. Aug. 24, 2023), *aff'd in part, rev'd in part*, 120 F.4th 494 (5th Cir. 2024), *reh'g en banc granted, opinion vacated*, 138 F.4th 961 (5th Cir. 2025); *Texas Med Ass'n v. HHS*, No. 6:23-CV-59 (JDK), 2023 WL 4977746 (E.D. Tex. Aug. 3, 2023). The Departments reopened the IDR portal in phases, and operations fully resumed by December 2023.

## III. District Court Proceedings

In April 2023, Neurological Surgery filed suit against the Departments and high-level officials of those agencies alleging that their failure to lawfully implement the No Suprises Act violated the APA and the Due Process Clause of the Fifth Amendment.[2] Among other things, Neurological Surgery sought to compel the Departments to enforce the statutory deadlines set forth by the Act on healthcare plans and IDR entities. The Departments moved to dismiss, and the district court granted their motion in July 2023. *See Neurological Surgery Prac. of Long Island, PLLC v. Dep't of Health & Hum. Servs.*, 682 F. Supp. 3d 249 (E.D.N.Y. 2023). The district court held that Neurological Surgery lacked standing to compel the Departments to enforce provisions of the Act against third parties, and that Neurological Surgery failed to show that its injuries were fairly traceable to the Departments' alleged actions or inactions. *Id.* at 258.

Following its dismissal order, the district court allowed Neurological Surgery to amend its complaint. *Id.* at 264. Neurological Surgery did so and filed an amended complaint later that month alleging three claims. The first and second claims, brought pursuant to the APA and the All Writs Act, 28 U.S.C. § 1651, asserted that the Departments (i) had failed to "ensure that a sufficient number of [IDR] entities [were] certified . . . to ensure the timely and efficient provision of [IDR] determinations"; and (ii) had issued erroneous guidance about the scope of New York's surprise billing

---

[2] Neurological Surgery's initial complaint also alleged a violation of the Takings Clause of the Fifth Amendment, but it has since dropped that claim.

law. App'x at 234–37. The third claim asserted that the Departments had also violated the Due Process Clause by doing so, and by failing to compel healthcare plans and IDR entities to comply with the deadlines set by the Act. Neurological Surgery sought declaratory relief, as well as an injunction and a writ of mandamus directing the Departments to: (i) take all steps necessary to obey the Act's mandate that the Departments shall ensure that a sufficient number of IDR entities are certified; (ii) withdraw the Departments' purportedly erroneous guidance about New York's surprise billing law and issue a correction; and (iii) compel healthcare plans to make timely payments under the Act, including by adopting procedures to monitor the plans' compliance with statutory deadlines, and compel the IDR entities to follow the deadlines for the payment determinations.

The Departments renewed their motion to dismiss Neurological Surgery's amended complaint. While that motion was pending, the Texas district court vacated portions of the regulations governing the IDR process, and the Departments paused IDR operations to make the changes necessary to comply with that court's decision. In September 2023, Neurological Surgery moved for leave to file a second amended complaint, adding a request that the district court order the Departments to fully restart all IDR process operations immediately. The Departments opposed the motion, arguing in part that Neurological Surgery's proposed amendment had already been mooted by the reopening of the IDR process, which was already under way.

11

After confirming that the IDR process was open and had been for multiple months, the district court granted the motion to dismiss. *See Neurological Surgery Prac. of Long Island, PLLC v. Dep't of Health & Hum. Servs.*, No. 23-CV-2977 (BMC), 2024 WL 3327640 (E.D.N.Y. Apr. 1, 2024). The court agreed that Neurological Surgery's attempt to challenge the pause was moot because the IDR process was operational for all claims and "all present circumstances" supported the conclusion that a global pause was unlikely to recur. *Id.* at *2. The court then dismissed all of Neurological Surgery's claims for mootness. In a footnote, noted that it agreed with the Departments "that the [c]ourt's reasoning in dismissing the original complaint is just as applicable to the amended complaint." *Id.* at *2 n.1. The court explained that there were "no new allegations, and plaintiff [was] simply rearguing the substantive points under the No Surprises Act that this Court already rejected." *Id.* The court therefore confirmed that it would have dismissed the amended complaint regardless of the mootness issue. *Id.*

Neurological Surgery moved for reconsideration, arguing that "significant issues remain with the IDR portal and [No Surprises Act] implementation." App'x at 522, *see id.* at 521–27. The district court denied that motion on June 11, 2024. *See Neurological Surgery Prac. of Long Island, PLLC v. Dep't of Health & Hum. Servs.*, No. 23-CV-2977 (BMC), 2024 WL 3327639 (E.D.N.Y. June 11, 2024). The court reiterated that all of "plaintiff's claims were properly dismissed as moot." *Id.* at *2. The court also reaffirmed its conclusion that the "action should be dismissed on the merits even if it is not moot." *Id.*

It declined to compel the Departments to ensure "that a sufficient number of [IDR] entities are certified," holding that Neurological Surgery lacked standing under the APA because "the statute does not mandate any discrete actions to 'ensure' compliance with these requirements," and because Neurological Surgery cannot "point to any provision requiring defendants to certify a certain number of IDR [entities]." *Id.* at *2–3. As for the Departments' guidance document on New York's surprise billing law, the court noted that the Departments had already taken the guidance down and that there was no "discrete requirement" for the Departments to issue new guidance. *Id.* at *3; *see* App'x at 524. The court concluded that allowing Neurological Surgery to amend its complaint again would therefore be futile.

This appeal followed.

## IV. Discussion

We review a district court's grant of a motion to dismiss *de novo*, "accepting the allegations in the complaint as true and drawing all reasonable inferences in favor of the plaintiff." *Palmer v. Amazon.com, Inc.*, 51 F.4th 491, 503 (2d Cir. 2022). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). We also generally review *de novo* questions of standing and mootness. *Connecticut Citizens Def. League, Inc. v. Lamont*, 6 F.4th 439, 444 (2d Cir. 2021).

13

On appeal, Neurological Surgery asks us to vacate the grant of the Departments' motion to dismiss, challenging the district court's conclusions that: (i) Neurological Surgery's claims are moot; (ii) Neurological Surgery lacks standing to compel the Departments to enforce the deadlines in the No Surprises Act on healthcare plans and IDR entities; (iii) Neurological Surgery's claim that the Departments failed to certify a sufficient number of IDR entities is foreclosed under the APA because the No Surprises Act does not identify a discrete action that the Departments must take to comply with that mandate; and (iv) Neurological Surgery's claim that the Departments have failed to provide corrected guidance on New York's surprise billing law is also foreclosed by the APA for the same reasons.

For the reasons set forth below, we substantially agree with the district court's conclusions and affirm its dismissal of Neurological Surgery's amended complaint.

### a. Only Neurological Surgery's Challenge to the Pause of the IDR Portal Is Moot

Article III of the Constitution requires that a live case or controversy must exist at all stages of federal court proceedings to support a court's subject matter jurisdiction. *See Preiser v. Newkirk*, 422 U.S. 395, 401 (1975). The mootness doctrine is derived from that constitutional requirement, *see North Carolina v. Rice*, 404 U.S. 244, 246 (1971)—it "ensures that [a] litigant's interest in the outcome continues to exist throughout the life of the lawsuit*," Palmer*, 51 F.4th at 503 (internal quotation marks omitted). "The hallmark of a moot case or

14

controversy is that the relief sought can no longer be given or is no longer needed." *Martin-Trigona v. Shiff*, 702 F.2d 380, 386 (2d Cir. 1983). When that happens and "the parties lack a legally cognizable interest in the outcome, a case is moot and the federal court is divested of jurisdiction over it." *Catanzano v. Wing*, 277 F.3d 99, 107 (2d Cir. 2001) (internal citation and quotation marks omitted). So, "a case that is live at the outset may become moot when it becomes impossible for the courts, through the exercise of their remedial powers, to do anything to redress the injury." *Cook v. Colgate Univ.*, 992 F.2d 17, 19 (2d Cir. 1993) (internal quotation marks omitted).

In this case, Neurological Surgery seeks to challenge the Departments' temporary pause of the IDR portal and asks the district court for relief in the form of an order mandating that the Departments "[f]ully restart all IDR process operations immediately." App'x at 445. Though Neurological Surgery first moved to challenge the Departments' actions while the portal was paused, the portal has since been reopened. Indeed, the district court confirmed the IDR portal was operational and had been for multiple months at the time of its decision. Neurological Surgery does not allege that the portal has been paused again since then; nor does it dispute that the portal is currently operational. "[T]he relief sought" by Neurological Surgery—an order mandating the reopening of the portal—is thus "no longer needed." *Martin-Trigona*, 702 F.2d at 386. Any order requiring the Departments to restart the already operational IDR process would therefore be pointless.

15

Neurological Surgery argues that despite the reopening of the IDR portal, it is still entitled to relief because the government cannot show that a pause of the portal will not recur. This Court has recognized certain "exceptions to the mootness doctrine[,] includ[ing] voluntary cessation cases." *Srour v. New York City, New York*, 117 F.4th 72, 81 (2d Cir. 2024) (internal quotation marks omitted). "Under this principle, 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.'" *Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 603 (2d Cir. 2016) (quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982)). Instead, to render the case moot, a defendant must "demonstrate that (1) there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Id.* (internal quotation marks omitted). Although we generally review issues of mootness *de novo*, we review for abuse of discretion the district court's determination as to whether it is reasonable to expect a defendant's conduct to recur. *Connecticut Citizens Def. League*, 6 F.4th at 446.

The district court here found that "all present circumstances point to the fact that [the challenged conduct] will not [recur]," and characterized the possibility of recurrence as "entirely speculative." *Neurological Surgery*, 2024 WL 3327640, at *2. The district court stated there was nothing in the record to suggest that "if some . . . practical infirmity arises, it cannot be dealt with without the kind of global pause that was implemented here." *Id.* On reconsideration, the

16

district court again found that "[n]othing in the record suggests that there will be another decision [like the Texas district court decision] requiring an additional pause of the IDR process, and [P]laintiff cites no other reasons why the alleged misconduct is likely to recur." *Neurological Surgery*, 2024 WL 3327639, at *2. The court noted that "[t]he mere fact that defendants previously paused the IDR process does not make it any more likely that defendants will do so again in the future." *Id.*

We find no abuse of discretion in the district court's determination that another pause is unlikely to recur. Given the circumstances—that the Departments paused the portal in response to federal judicial decisions that vacated certain of the Departments' No Surprises Act implementing regulations—we agree with the district court that the likelihood of another pause seems "only a theoretical and speculative possibility." *Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.*, 397 F.3d 77, 87 (2d Cir. 2005). The possibility that unspecified future litigation may again take the portal offline is too remote a possibility to substantiate Neurological Surgery's claim. We also note that the voluntary cessation doctrine "traces to the principle that a party should not be able to evade judicial review, or to defeat a judgment, by temporarily altering questionable behavior." *City News & Novelty, Inc. v. City of Waukesha*, 531 U.S. 278, 284 n. 1 (2001). There is nothing in the record here to suggest that the government temporarily reopened the IDR portal to evade judicial review in this case—rather, as noted above, the portal was stopped and restarted for reasons wholly unrelated to this litigation. Accordingly, we affirm

17

the district court's dismissal of Neurological Surgery's challenge to the pause of the IDR portal as moot.

We note, however, that the district court dismissed all of Neurological Surgery's claims as moot based on the reopening of the IDR portal. *See Neurological Surgery*, 2024 WL 3327640, at *2 ("I agree with [the Departments] that this case is moot."). We find this approach incorrect. Though the reopening rendered moot its claim specifically challenging the pause of the portal, Neurological Surgery's other claims regarding the failure to enforce statutory deadlines, the failure to certify a sufficient number of IDR entities, and the failure to provide guidance on the New York Surprise Bill Law, which it brought prior to the pause, remain unaffected by the reopening of the portal. The district court found that "[t]here is nothing in the record to suggest that the new process is inadequate to handle the previously-unanticipated number of claims," *id.*, but there is nothing in the record to suggest that the reopening of the portal resolved the other issues alleged by Neurological Surgery. That said, the district court also concluded that Neurological Surgery's remaining claims failed on alternative grounds. As we discuss below, that conclusion was correct and provided an independent basis for dismissal of the amended complaint in its entirety.

### b. Neurological Surgery Lacks Standing to Compel the Departments to Enforce Statutory Deadlines on Healthcare Plans and IDR Entities

We next consider the district court's determination that Neurological Surgery lacks standing under the APA and Due Process

Clause to compel the Departments to enforce the Act's deadlines on healthcare plans and IDR entities. As an initial matter, though Neurological Surgery's original complaint included an APA claim challenging the Departments' failure to enforce deadlines, its amended complaint does not. *Compare* App'x at 31–33 *with id.* at 234–245. "[I]t is well-established that an amended complaint ordinarily supersedes the original, and renders it of no legal effect." *Dluhos v. Floating & Abandoned Vessel, Known as New York*, 162 F.3d 63, 68 (2d Cir. 1998) (internal quotation marks omitted); *see also Austin v. Ford Models, Inc.*, 149 F.3d 148, 155 (2d Cir. 1998) ("[A]ll causes of action alleged in an original complaint which are not alleged in an amended complaint are waived." (internal quotation marks omitted)). Neurological Surgery has therefore forfeited its APA challenge to the Departments' nonenforcement of deadlines by failing to include the claim in its amended complaint. Accordingly, we address only Neurological Surgery's standing to bring a due process claim.[3]

Like the mootness doctrine, the standing doctrine also emerges from Article III and was developed to "ensure the presence of 'that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends.'" *Lee v. Bd. of Govs. of the Fed.*

---

[3] Even if this Court were to (very broadly) construe the amended complaint as bringing an APA claim challenging the Departments' failure to enforce deadlines, any such claim would be unreviewable. *See Heckler v. Chaney*, 470 U.S. 821, 831 (1985) ("[A]n agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion.").

*Rsrv. Sys.*, 118 F.3d 905, 910 (2d Cir. 1997) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)). "The constitutional limitations of Article III demand that [plaintiffs] demonstrate injury flowing from [a] challenged [action]." *Id.* Accordingly, the doctrine imposes three familiar requirements: "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Importantly, "[the] plaintiff must demonstrate standing for each claim and form of relief sought." *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011) (internal quotation marks omitted).

The Supreme Court has emphasized that standing is "substantially more difficult to establish" where, like here, "the plaintiff is not himself the object of the government action or inaction he challenges." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992) (internal quotation marks omitted). The Court observed: "When . . . a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*, much more is needed [than in cases where the plaintiff is the object of government action]." *Id.* (emphasis in original). "This stems not from the absence of concrete injury but rather from want of the remaining constitutional elements of standing: causation and redressability." *Lee*, 118 F.3d at 912. It is "the burden of the plaintiff to adduce facts showing that [the choices of the third party] have been or will be made in such manner as to produce causation and permit redressability of injury." *Lujan*, 504 U.S. at 562. Thus, "[w]hile . . . it

does not suffice [for standing] if the injury complained of is the result of the *independent* action of some third party not before the court, that does not exclude injury produced by determinative or coercive effect upon the action of someone else." *Bennett v. Spear*, 520 U.S. 154, 169 (1997) (internal quotation marks, alteration marks, and citations omitted).

We agree with the district court that to the extent Neurological Surgery seeks to compel enforcement of the deadlines on healthcare plans and IDR entities, it lacks standing to do so. Neither party disputes that Neurological Surgery has shown an actual, concrete injury in the form of delayed payments for the services it has provided. But we read the amended complaint to suggest that that injury is caused by the healthcare plans and IDR entities, not by the Departments, and therefore hold that Neurological Surgery has failed to carry its burden of alleging causation and redressability.

Neurological Surgery's amended complaint alleges primarily that its compensation payments were delayed due to the failure of healthcare plans and IDR entities to faithfully comply with the provisions of the Act. The amended complaint alleges that "the health[care] plans have completely failed to comply with" the deadlines set by the Act, and that when they do comply, they often make *de minimis* initial payments up front and rely on the IDR process to delay full payment to providers like Neurological Surgery. App'x at 222. The amended complaint similarly alleges that the IDR entities have "routinely ignored" the deadlines set by the Act, and that even when the process is running, the lack of a sufficient number of IDR

21

entities coupled with high demand for the entities results in delayed compensation determinations and, therefore, belated payments to Neurological Surgery for their services. App'x at 224. We thus read the amended complaint to claim that Neurological Surgery's injury is caused by the actions of the healthcare plans and IDR entities.

With respect to the Departments, the amended complaint states only in a vague and conclusory fashion that the Departments' "actions and inactions" have "rendered the IDR process untimely, ineffective, and inefficient." *Id.* at 239. Though we have previously stated that "a plaintiff's injury need not be 'directly' attributable to a defendant in order to show the causation element of standing to sue that defendant," the injury must still be "fairly traceable to that defendant." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 59 (2d Cir. 2016) (internal quotation marks omitted).[4] But Neurological Surgery fails to allege sufficient facts indicating that the delayed payments are "fairly traceable" to the Departments' actions or inactions. To the extent the amended complaint establishes any connection between Neurological Surgery's injury and the Departments' actions, we conclude that the connection is "too speculative [and] too attenuated" to establish standing. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 383 (2024). Neurological Surgery urges us to make the connection

---

[4] We note that Neurological Surgery attempts to reframe the IDR entities as "agents of the Departments" to argue that they are not in fact "third-parties." Appellant Br. at 29. We are unpersuaded by this argument. Neurological Surgery fails to allege any facts in the amended complaint to establish a principal-agent relationship. Indeed, the complaint characterizes the entities as "third-party IDR entities—essentially dispute resolution neutrals." App'x at 216. This argument therefore fails.

that its injury *was caused by* the failure of the healthcare plans and IDR entities to meet deadlines, which *was caused by* the Departments' failure to enforce them. But the facts alleged in the complaint do not suggest the Departments' inaction had a determinative effect on the third parties—indeed, it is not "sufficiently predictable" from the complaint how either third party would react to the Departments' enforcement of deadlines. *Id.* The healthcare plans might not find it feasible to meet the deadlines, and the complaint in fact suggests that the IDR entities likely do not have the resources to meet the deadlines even if enforced. Neurological Surgery asks our Court to make the speculative inference that these third parties would follow the deadlines if enforced, but it has failed to allege any facts to suggest they would. *See Lujan*, 504 U.S. at 562. We hold that it has therefore failed to show causation and to establish its standing to compel the Departments to take action.

Neurological Surgery's claim also separately fails because it has not shown that its injury is likely to be "redressed by a favorable judicial decision." *Spokeo*, 578 U.S. 338. Causation and redressability are often "flip sides of the same coin." *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 288 (2008). "If a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury." *FDA*, 602 U.S. at 381. But because Neurological Surgery cannot show that its injury was caused by the Departments' inaction, it also cannot show that the relief it seeks would redress its injury. As we allude to above, the amended complaint suggests that if the Departments were to enforce deadlines

23

on the healthcare plans and IDR entities, Neurological Surgery would continue to suffer from delayed payments for its services. For the healthcare plans, "it [is] far better to retain the appropriate reimbursement funds in their coffers" and "pressure [providers] to accept low in-network rates," rather than "pay an appropriate amount in the first instance." App'x at 222. And the low number of certified IDR entities faced with high demand for payment determinations casts doubt on their ability to meet any deadlines. Thus, even if we were to direct the district court to grant Neurological Surgery the relief it requests, the facts as alleged in the complaint suggest that Neurological Surgery would likely continue to suffer from the same injury. Healthcare plans would remain incentivized to make only *de minimis* initial payments to delay full payment up front, and the IDR entities would remain constrained to delay payment determinations due to their low numbers. As the Departments point out, Neurological Surgery "has not explained what actions it believes the Departments have the authority and resources to take that would ensure that IDR entities and [healthcare plans] meet the[] deadlines." Appellee Br. at 18–19. Thus, Neurological Surgery fails to show that its injury would be redressed by the relief it requests.

Accordingly, we conclude that the district court properly found that Neurological Surgery lacked standing to compel the Department to enforce the statutory deadlines on healthcare plans and IDR

24

entities.  We therefore affirm the dismissal of Neurological Surgery's due process claim seeking to compel the Departments to do so.[5]

### c. Neurological Surgery's Challenge to the Departments' Failure to Certify a Sufficient Number of IDR Entities Is Foreclosed by the APA

We next turn to the district court's dismissal of Neurological Surgery's challenge to the Departments' failure to certify a sufficient

---

[5] In its amended complaint, Neurological Surgery also alleged, as part of its due process claim, that the Departments caused the payment delays by "[f]ailing to obey the Congressional mandate that the Departments shall ensure that a sufficient number of [IDR] entities are certified . . . to ensure the timely and efficient provision of [IDR] determinations."  App'x at 240 (internal quotation marks, citation, and emphasis omitted).  It therefore sought an injunction ordering the Departments to "[t]ake all steps necessary to obey" the requirement that they ensure that a sufficient number of IDR entities are certified.  *Id*. at 241.  The parties do not dispute that Neurological Surgery had standing to do so.  However, the district court held that Neurological Surgery's due process challenge under either theory failed to state a claim because (i) Neurological Surgery did not identify a federally protected constitutional right and cited only New York state cases; and (ii) Neurological Surgery did not show any deprivation of that right at the hands of the government rather than third parties.  On appeal, Neurological Surgery summarily states that the entitlement to be reimbursed for services rendered at the request of a patient is a "cognizable property interest [and] is protected against unlawful federal interference under the due process and takings clauses of the Fifth Amendment."  Appellant Br. at 33.  Neurological Surgery fails to develop the argument further or to engage with the district court's decision beyond citing the same state cases.  Because it has failed to sufficiently brief the issue, we conclude that it has forfeited *any* due process challenge to the district court's decision. *See Tolbert v. Queens Coll.*, 242 F.3d 58, 75 (2d Cir. 2001) ("It is a settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (internal quotation marks omitted)); *Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998) ("Issues not sufficiently argued in the briefs are considered waived and normally will not be addressed on appeal.").

number of IDR entities.[6]  Neurological Surgery alleges that the Departments' failure to certify enough IDR entities violates the No Surprises Act and has resulted in delayed payment determinations, which consequently delayed compensation to Neurological Surgery for its services.  Neurological Surgery therefore brings a claim under Section 706(1) of APA to compel the Departments to "meet the IDR certification mandate" of the Act.  Appellant Br. at 37.

Section 706(1) allows a court to "compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).  A claim under this section may proceed only where the plaintiff identifies a "discrete agency action that [the agency] is required to take." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (emphases omitted).  The limitation to *discrete* agency action precludes "broad programmatic attack[s]" on agency operations, and "[t]he limitation to *required* agency action rules out judicial direction of even discrete agency action that is not demanded by law."  *Id.* at 64–65.  The Supreme Court has explained that, like the power to grant writs of mandamus, "§ 706(1) empowers a court only to compel an

---

[6] In its brief before our Court, Neurological Surgery argues only that it has a cognizable claim under Section 706(1) of the APA.  It has consequently forfeited any challenge to the district court's holding under the Due Process Clause (as we discuss in the footnote above) or other provisions of the APA. *See JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418, 428 (2d Cir. 2005) ("[A]rguments not made in an appellant's opening brief are waived even if the appellant pursued those arguments in the district court or raised them in a reply brief.").  Similarly, although the district court does not appear to have passed on Neurological Surgery's claims under the All Writs Act, Neurological Surgery does not challenge that potential infirmity on appeal and has therefore waived the issue. We therefore address only Neurological Surgery's Section 706(1) claim.

agency to perform a ministerial or non-discretionary act, or to take action upon a matter, without directing *how* it shall act." *Id*. at 64 (internal quotation marks and citation omitted). So, "when an agency is compelled by law to act within a certain time period, but the manner of its action is left to the agency's discretion, a court can compel the agency to act, but has no power to specify what the action must be." *Id*. at 65.

Neurological Surgery argues that "[t]he requirement that the Departments shall ensure that a sufficient number of IDR entities are certified to ensure the timely and efficient provision of IDR determinations" is a discrete agency action that the Departments are required to take under the No Suprises Act. Appellant Br. at 36 (internal quotation marks, alteration, and citation omitted). We disagree. Section 300gg-111(c)(4)(A) of the Act states that the Secretary of Health and Human Services, in consultation with the Secretary of Labor and Secretary of the Treasury, "shall establish a process to certify (including to recertify) [IDR] entities." Section 300gg-111(c)(4)(E) in turn states that "[t]he process described in subparagraph (A) shall ensure that a sufficient number of entities are certified under this paragraph to ensure the timely and efficient provision of determinations." The Act therefore does require a discrete action from the Departments: They must "establish a process to certify" a "sufficient number" IDR entities. It is undisputed that the Departments have done so. But the statute does not provide that the Departments must take additional discrete measures, such as

27

monitoring the output of the certification process, to "ensure that a sufficient number of entities are certified."[7]

Most critically, Neurological Surgery has not identified a discrete action that the Departments have failed to take. Indeed, its failure to do so is evident in the very relief that Neurological Surgery asks for: a declaration, writ of mandamus, and/or permanent injunction "directing that the Departments . . . [t]ake all steps necessary to obey the Congressional mandate that the Departments shall ensure that a sufficient number of IDR entities are certified." App'x at 235, 237, 241. Neurological Surgery elaborates in its brief that it "is not asking the Court to curtail [the Departments'] discretion *by identifying particular steps [they] are required to take* to comply with the statute." Appellant Br. at 37 (emphasis added). But that is the precise problem with Neurological Surgery's claim. It cannot "outlin[e] discrete actions that a court may require [the Departments] to do," *Benzman v. Whitman*, 523 F.3d 119, 131 (2d Cir. 2008), because there are no such actions enumerated in the statute. Thus, Neurological Surgery is left with the "broad programmatic attack" of asking our Court to mandate that the Departments take "all steps

---

[7] We acknowledge, however, that the Act is specific enough to require that the Departments certify at least some IDR entities. Had the Departments failed to certify *any* entity, that would have been the type of failure that could be challenged under the Act as a failure to "ensure that a sufficient number of entities are certified." 42 U.S.C. § 300gg-111(c)(4)(E). In that case, while we still could not tell the Departments how many IDR entities to make available, a party could compel the Departments under the APA to certify at least some.

necessary" to comply with the Act—exactly the type of vague challenge foreclosed by the APA. *Norton*, 542 U.S. at 64.

We take this opportunity to emphasize again why APA review is not available in cases like the one before us. The Supreme Court has explained that the principal purpose of limiting APA claims to discrete agency actions that agencies are required to take "is to protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve." *Id.* at 66. Indeed, if our Court was empowered to grant Neurological Surgery the request it seeks, we would necessarily take on the role of an oversight body with the task of determining how many IDR entities are "sufficient" for the certification process, or what constitutes the "timely and efficient" provision of payment determinations. 42 U.S.C. § 300gg-111(c)(4)(E). Our Court, "rather than the agency, [would] work out compliance with the broad statutory mandate, injecting the judge into day-to-day agency management." *Norton*, 542 U.S. at 66–67. As previously noted, there are any number of complexities involved in certifying IDR entities. That "prospect of pervasive oversight by federal courts over the manner and pace of agency compliance with such congressional directives is not contemplated by the APA." *Id.*

The Court sympathizes with Neurological Surgery's complaint that delays are rampant with the IDR process because there are not enough IDR entities and that it, in turn, has been forced to wait to receive adequate compensation for the services it provides. But

29

Neurological Surgery "cannot seek wholesale improvement of th[e] [IDR process] by court decree, rather than in the offices of the Department or the halls of Congress, where programmatic improvements are normally made." *Lujan*, 497 U.S. at 891 (emphasis omitted). Accordingly, we hold that the district court properly found that Neurological Surgery's challenge to the Departments' failure to certify a sufficient number of IDR entities is foreclosed by the APA. We therefore affirm its dismissal of the claim.

### d. Neurological Surgery's Challenge to the Departments' Failure to Provide Guidance on New York's Surprise Billing Law Fails to State a Claim

Finally, we address Neurological Surgery's challenge to the Departments' failure to provide guidance on New York's Surprise Billing Law. Neurological Surgery seeks to compel the Departments to issue affirmative guidance regarding the eligibility criteria for arbitration under the New York statute. For some time, the Departments had guidance regarding the statute on the Centers for Medicare & Medicaid Services website. Neurological Surgery alleges that the guidance was incorrect, as it misstated the scope of New York's surprise billing law, causing IDR entities to conclude mistakenly that certain disputes were not eligible for the federal IDR process.

The parties agree that the Departments have since withdrawn the guidance. Nevertheless, Neurological Surgery asks this Court to compel the Departments "to take all steps necessary to correct its erroneous determination, including providing clarified guidance."

Appellant Br. at 41. However, Neurological Surgery cites no authority supporting its contention that an agency must issue a "notice of [a] change in policy or clarification of [a] governing law" when it removes guidance from its website. *Id.* Nor does Neurological Surgery contend that the failure to issue proper clarification is a "discrete agency action that [the agency] is required to take" under the No Surprises Act. *Norton*, 542 U.S. at 64. For those reasons, it has failed to state a claim under the APA, and we therefore affirm the district court's dismissal.

## V. Conclusion

In sum, we hold as follows:

1. Neurological Surgery's challenge to the pause of the IDR portal is moot. The portal is currently operational, and the district court did not abuse its discretion in finding that the possibility of recurrence is entirely speculative.

2. Neurological Surgery lacks standing to compel the Departments to enforce the Act's deadlines on healthcare plans and IDR entities. Though Neurological Surgery has shown an injury in the form of delayed payments for its services, we read its amended complaint to suggest that its injury is caused by the healthcare plans and IDR entities, not by the Departments. The district court therefore properly concluded Neurological Surgery has failed to establish standing to advance this claim.

31

3. Neurological Surgery's challenge to the Departments' failure to certify a sufficient number of IDR entities is foreclosed by the APA. The No Surprises Act does not require that the Departments themselves ensure that a sufficient number of IDR entities are certified, nor does the Act identify any discrete actions the Department must take to do so. Thus, the district court rightly held that Neurological Surgery has failed to show a discrete action that the Departments are required to take, precluding APA review of its claim.

4. Neurological Surgery's challenge to the Departments' failure to issue guidance on the New York Surprise Bill Law fails to state a claim. Neurological Surgery has failed to allege that the issuance of additional guidance to clarify the scope of the New York law is a discrete agency action that the Departments are required to take under the No Surprises Act. It has therefore failed to state a claim under the APA.

Accordingly, we AFFIRM the district court's judgment.